**Affirmed and Opinion filed December 18, 2014.**



In The

# Fourteenth Court of Appeals

## NO. 14-14-00045-CV

## M & F WORLDWIDE CORP., MCG INTERMEDIATE HOLDINGS, INC., MAFCO WORLDWIDE CORPORATION, MAFCO CONSOLIDATED GROUP LLC, AND PCT INTERNATIONAL HOLDINGS, INC., Appellants

### V.

## PEPSI-COLA METROPOLITAN BOTTLING COMPANY, Appellee

**On Appeal from the 80th District Court
Harris County, Texas
Trial Court Cause No. 2011-77606**

## O P I N I O N

This is an interlocutory appeal[1] from the denial of the special appearances filed by defendants M & F Worldwide Corp. (M&F Worldwide), MCG Intermediate Holdings Inc. (MCG Holdings), Mafco Worldwide Corporation (Mafco Worldwide), Mafco Consolidated Group LLC (Mafco Consolidated), and

---

[1] *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(7).

PCT International Holdings Inc. (PCT International), collectively, the "Mafco Defendants," in this tortious interference suit brought by Pepsi-Cola Metropolitan Bottling Company (Pepsi). Because we conclude that the trial court properly denied these nonresident defendants' special appearances, we affirm.

## BACKGROUND

Pepsi filed this lawsuit in Texas in December 2011, asserting various tort claims, including tortious interference with a 1988 stock purchase agreement, fraudulent transfer, and conversion of certain insurance assets against the Mafco Defendants and others,[2] including Cooper Industries, LLC;[3] Cooper Industries, Ltd.;[4] Cooper Holdings, Ltd.;[5] Cooper US, Inc.;[6] and Cooper Industries plc.,[7] companies that we will refer to hereinafter as the "Cooper companies" for ease of reference. Pepsi also sued the Pneumo Abex Asbetos Claims Settlement Trust (the Trust), which is a Delaware trust managed by a Texas company, Integra

---

[2] The parties initially agreed that Pepsi's First Amended Petition is the operative pleading for this appeal. The Mafco Defendants have since requested that this court take judicial notice of Pepsi's Motion for Leave to Amend and Third Amended Petition, filed on June 20, 2014, and Pepsi's notice of non-suit of the Trust, filed June 28, 2014. Pepsi has not opposed this request; thus we grant it. We note that there is nothing to indicate that the trial court actually permitted Pepsi to amend its pleadings; thus the operative pleading for our jurisdictional analysis remains the one identified by the parties in this proceeding. Moreover, the jurisdictional contacts by the Mafco Defendants have not changed despite this amendment and non-suit. Thus, our taking judicial notice of these filings by Pepsi has no bearing on our disposition of this appeal.

[3] Cooper Industries, LLC is a Delaware corporation headquartered in Houston.

[4] Cooper Industries, Ltd. Is a foreign corporation organized and existing under the laws of Bermuda.

[5] Cooper Holdings, Ltd. was a Bermuda corporation headquartered in Bermuda, but allegedly merged into Cooper UK Subco, LLC in July 2011.

[6] Cooper US, Inc. is a Delaware corporation headquartered in Houston.

[7] Cooper Industries plc. is a foreign corporation organized and existing under the laws of Ireland.

Management Company, LLC (Integra). In its First Amended Petition, Pepsi alleged that torts had been committed in whole or in part in Texas:

> Through the Plan C Agreement, which was designed to interfere with Pneumo Abex's [contractual] indemnity and hold harmless obligations to [Pepsi], these defendants: (1) created and funded the Trust; (2) impaired or converted [Pepsi]'s rights to insurance proceeds and other insurance related and/or property rights, and transferred certain of those rights or property to the Trust; (3) engaged in conspiracies with Texas residents; and (4) committed all of these acts with the knowledge that the Trust and its agent (Integra) would pay for and administer thousands of [asbestos] Products Claims cases through Integra's offices and actions in Texas.

As background to the underlying suit, through a series of transactions and corporate transformations, Pepsi acquired certain indemnity rights associated with asbestos-related claims. The responsibility to provide Pepsi that indemnity traces through a more complex series of transactions; corporate transformations, a bankruptcy, a lawsuit, and a settlement agreement. The relationships between the various parties, nonparties, and agreements are all relevant to our analysis of Texas contacts and, therefore, we set them forth in some detail.

First, the 1988 stock purchase agreement (1988 SPA) created certain indemnity rights for asbestos-related claims as follows.[8] IC Industries, Pepsi's predecessor in interest, owned two corporations that produced asbestos containing products: Pneumo Abex Corp. and Abex Corp. Through the 1988 SPA, IC Industries transferred these corporations to PA Holdings.[9] Pneumo Abex Corp. and Abex Corp. agreed, as part of the 1988 SPA, to indemnify IC Holdings for, as is relevant here, all asbestos-related claims filed after August 1998. PA Holdings

---

[8] The SPA closed in New York City and contained a New York choice-of-law clause.

[9] Both IC Industries and PA Holdings were Delaware corporations. So too were Pneumo Abex Corp. and Abex Corp.

3

later merged with Pneumo Abex Corp. and Abex Corp., and the companies became Pneumo Abex Corp. As such, Pneumo Abex Corp. thereafter owed the post-August 1998 indemnification obligation to IC Industries. Through succession, Pepsi became entitled to IC Industries' indemnification rights.[10]

Several subsequent transfers of the assets and liabilities of Pneumo Abex Corp. occurred among affiliates of MacAndrews & Forbes Holdings Inc. (MacAndrews) and the Cooper companies. The MacAndrews-affiliated companies include all of the Mafco Defendants.[11] Through these various transfers, Pneumo Abex Corp. acquired indemnity obligations for the same asbestos claims for which it owed Pepsi indemnification. In 1995, Pneumo Abex Corp. became an affiliate of MacAndrews, and MCG Holdings began managing and funding Pneumo Abex Corp.'s non-friction related asbestos indemnification obligations; Pneumo Abex Corp. remained financially responsible for all of these liabilities, however. Meanwhile, from 1998 to 2001, the indemnification owed to Pepsi by Pneumo Abex Corp. for automotive-related asbestos claims was provided by another corporation to which Cooper had transferred ownership of its automotive products business. This corporation, Federal Mogul Corp., filed for bankruptcy protection in 2001, and under the terms of a guaranty, Cooper again became responsible for Pneumo Abex's automotive friction products indemnification obligations.

In 2004, Pneumo Abex Corp. disposed of all assets and liabilities relating to its only business and merged into Pneumo Abex LLC (hereafter, Pneumo Abex). Also in 2004, Mafco Worldwide became responsible for the indemnification and defense obligations Pneumo Abex owed to Pepsi for asbestos claims arising from

---

[10] Pepsi is a New Jersey corporation with its headquarters and principal place of business located in New York.

[11] It is undisputed that none of the Mafco Defendants are Texas residents and they do not have offices or employees in Texas.

aerospace products, a much smaller subset of the overall asbestos-related claims. The Cooper companies provided indemnities and defense obligations to Pepsi for the much larger portion of asbestos claims arising from Pneumo Abex's automotive friction products. Since 2004, Pneumo Abex "has not conducted any business operations nor owned any assets other than insurance and indemnity rights directly related" to the various product claims.

Pneumo Abex, the Mafco Defendants, and the Cooper companies discussed disputed issues relating to Pneumo Abex's asbestos liabilities and assets. In 2006, the Mafco Defendants, through representatives Steven Fasman, Barry Schwartz, and their attorney,[12] traveled to Texas to meet with the Cooper companies about the Federal Mogul bankruptcy. In 2007, as part of the bankruptcy proceedings of Federal Mogul, the Cooper companies and Pneumo Abex proposed two alternative plans to address the Pneumo Abex indemnity obligations. Plan A involved the creation of a subfund of the Federal Mogul bankruptcy trust to address certain Pneumo Abex asbestos claims, including those related to the non-friction business indemnified by the Mafco Defendants.

As early as January 2008, the Cooper companies and MacAndrews were discussing "various alternatives to Plan B . . . in the event that Plan A [was] rejected." In February 2008, Fasman outlined several proposals "for Cooper LLC's consideration" to address "possible structures intended to address alternatives superior to Plan B, should Plan A prove unsuccessful." Plan A was publicly proposed and briefed to the Federal Mogul bankruptcy court, but the court rejected this plan. Plan B, under which Pneumo Abex and the Cooper companies

---

[12] The record reflects that, as of the date of the Plan C settlement agreement discussed *infra*, Fasman was the Senior Vice President of M&F Worldwide, the President of Pneumo Abex LLC, the Assistant Secretary of Mafco Worldwide, the Senior Vice President of Mafco Consolidated, and the Senior Vice President of PCT International. Barry Schwartz was the Executive Vice Chairman and Chief Administrative Officer of MacAndrews in January 2008.

received $140 million to resolve claims against Federal Mogul, was approved by the bankruptcy court.

A year later, on February 5, 2009, Mafco Defendants' representatives Schwartz and Fasman traveled to Houston and met with Cooper executives. The record reflects that Kirk Hachigian, Chairman and Chief Executive Officer of Cooper Industries, emailed Schwartz the next day, thanking him for the "trip to Houston" and stating that they had a "good post meeting," which resulted in a "few ideas." In this email, Hachigian stated, "[I]n the end, it would be best for both of us to find a middle ground here and put something together." Hachigian also thanked Schwartz for "reaching out."

After this meeting, it appears that negotiations of what became known as Plan C ramped up.[13] On February 12, 2009, Cooper Industries representative Heath Monesmith emailed Fasman, explaining that the Cooper companies would "need an IRS private letter ruling to do this deal" and suggesting that "that process be started immediately." Beginning in June 2009 and throughout the entire negotiation leading up to the execution of the April 2011 Plan C settlement agreement, the Mafco Defendants, Pneumo Abex (which was then a subsidiary of M&F Worldwide), and the Cooper companies entered tolling and standstill agreements regarding their allegedly disputed claims.

In July 2009, M&F Worldwide sent a written request to the IRS, requesting a pre-submission conference (the July 2009 IRS letter). In this letter, M&F Worldwide outlined the general structure of Plan C, noting that it was the indirect owner of all interest in Pneumo Abex and PCT International, and explaining its

---

[13] Although the details of Plan C changed over time, this plan generally involved discussions of various ways to resolve the parties' disputed claims concerning the future asbestos liabilities of Pneumo Abex.

"ongoing disputes" with the Cooper companies. According to the July 2009 IRS letter, Pneumo Abex and the Cooper companies had "disputed claims" against each other regarding various corporate transactions and the scope of the Cooper companies' obligations to Pneumo Abex. In this letter, M&F Worldwide proposed a transaction through which Pneumo Abex and the Cooper companies would assert their "disputed claims" against each other in "an appropriate court." The parties intended to propose a settlement agreement that would include a qualified settlement trust. Drafts of this letter were communicated to the Cooper companies' tax representative located in Texas.

In November 2009, Fasman again traveled to Texas, this time to Dallas. Fasman described the purpose of this trip as "to speak with a lawyer retained by the Cooper board. . . . It was a discussion with this lawyer about his opinions regarding Plan C." During breaks at this meeting, Fasman acknowledged that there were also discussions with the Cooper companies' representatives about Plan C. Then, in January 2010, M&F Worldwide, on its own behalf and on behalf of Pneumo Abex and PCT International, sent a second letter to the IRS, requesting a ruling regarding the proposed transaction outlined in its July 2009 IRS letter and discussed at a July 2009 conference with IRS personnel. In this letter, M&F Worldwide stated that it and the Cooper companies intended to have Pneumo Abex and the Cooper companies initiate a lawsuit in a Texas court "agreed upon by Pneumo and Cooper." The parties would then negotiate proposed settlement documents and set a settlement conference with a Texas court for approval. The Texas court would retain continuing jurisdiction over the settlement agreement and the qualified settlement trust set up pursuant to it. Attached to this letter was a detailed settlement timeline and a draft of a memorandum of understanding (MOU)

between M&F Worldwide, Pneumo Abex, and the Cooper companies embodying the terms of Plan C. This request for a ruling was later withdrawn.

In May 2010, Pneumo Abex filed suit against several of the Cooper companies in a New York state court seeking to enjoin them from entering into a proposed transaction with another defendant, Danaher Corporation. Prior to filing suit, an unidentified Mafco representative contacted Kirk Hachigian to discuss the suit. Notes for this conversation indicate that litigators have been instructed "to proceed full-steam-ahead," but the representative wanted Haghigian to know that M&F Worldwide "continue[d] to believe that Plan C (a Cooper-funded trust that would own Pneumo Abex and would release and indemnify both Cooper and [M&F Worldwide]) is the better way to go." These notes further indicate that the Mafco Defendants "made the decision to sue now" because they were "no longer optimistic that Plan C, or any other long-term solution, is possible."

In the New York litigation, Pneumo Abex alleged that the proposed transaction would interfere with the integrity of the Cooper companies' indemnification obligations. After the New York litigation was filed, Pneumo Abex, the Cooper companies, and the Mafco Defendants re-engaged in negotiations concerning Pneumo Abex's asbestos-claims obligations and their indemnification of them. A new IRS letter ruling was requested by the Mafco Defendants, seeking rulings regarding the settlement of the New York litigation and the creation of a qualified settlement trust. Starting in February 2009, hundreds of emails and phone calls were exchanged between the Mafco Defendants, Cooper personnel, and their respective attorneys about "Plan C." The Mafco Defendants had weekly conference calls about Plan C with Cooper representatives. When negotiations stalled several times, Mafco representatives reached out to Cooper representatives. Ultimately, the parties settled the New York litigation and all

8

existing disputes regarding Pneumo Abex's contingent asbestos liabilities by entering into a settlement agreement in New York and numerous ancillary agreements effectuating the terms of the settlement agreement (collectively, the Plan C Agreement).

The parties to the Plan C Agreement included the Mafco Defendants (except MCG Holdings), Pneumo Abex, and the Cooper companies. Under the terms of the Plan C Agreement, the Mafco Defendants, except MCG Holdings, agreed to: (1) release any claims against the Cooper companies; (2) obtain court approval of the settlement agreement; (3) establish the Pneumo Abex Asbestos Claims Settlement Trust (the Trust) under Delaware law; (4) transfer ownership and control of Pneumo Abex to the Trust; (5) transfer millions of dollars to Pneumo Abex and the Trust; (6) establish a management company to be owned by the Trust to manage day-to-day operations of Pneumo Abex; (7) pay, post-closing of the agreement, any insurance proceeds received on behalf of Pneumo Abex to Pneumo Abex; (8) transfer to Pneumo Abex all then-existing rights under the 1988 SPA and all other agreements through which Pneumo Abex directly or indirectly might be entitled to indemnification, contribution or reimbursement from anyone; and (9) cooperate with the Trust on defense of asbestos claims for nine months following the agreement. The agreement closed in April 2011 in New York. The Mafco Defendants executed the documents effectuating the details of the Plan C Agreement at the New York closing of the Plan C Agreement.

The Plan C Agreement allegedly terminated the Mafco Defendants' and the Cooper companies' indemnity and defense obligations to Pneumo Abex. The Trust indemnified the Mafco Defendants and the Cooper companies for product claims involving Pneumo Abex. Pursuant to the terms of the Plan C Agreement, Integra Management Company LLC was created to manage Pneumo Abex's product

9

claims and insurance recovery efforts. Integra is a Deleware corporation with a Spring, Texas principal place of business. The Mafco Defendants agreed that Integra would be managed by former Cooper employee and Texas resident Keith Odenweller. In April 2011, after the closing of the Plan C Agreement, the Mafco Defendants notified Pepsi that Pneumo Abex could be contacted in care of Integra at Integra's Texas address.

The subject lawsuit ensued. The Mafco Defendants filed special appearances. The gravamen of Pepsi's jurisdictional argument in response (and on appeal) was that from 2008 to 2011, the Mafco Defendants acted in concert with the Cooper companies to negotiate Plan C, which stripped Pneumo Abex of its back-up for the contractual indemnification obligations it owed to Pepsi away from the large and well-funded MacAndrews and Cooper families of business. Pepsi further asserted that these indemnification obligations were transfered to a trust that is administered from Texas. Stated differently, Pepsi urges that the Trust is the tool by which the Mafco Defendants and Cooper have collaborated to impair Pepsi's contractual indemnification rights.

The trial court denied the Mafco Defendants' special appearances after a December 2013 hearing. No findings of fact or conclusions of law were issued. The Mafco Defendants filed this interlocutory appeal.

### ANALYSIS

In four issues, the Mafco Defendants assert that the trial court erred in denying their special appearances. First, they urge that the trial court erred because Pepsi made global jurisdictional allegations, rather than specific allegations as to each of the Mafco Defendants, and the five Mafco Defendants proved that they are not Texas entities or residents. Second, the Mafo Defendants argue that (a) there is no evidence that any of them had sufficient minimum contacts with Texas, (b) as a

10

matter of law, there is no substantial connection between any of the Mafco Defendants' contacts with Texas and the operative facts of this litigation, and (c) allowing a Texas court to exercise specific jurisdiction over the Mafco Defendants would offend traditional notions of fair play and substantial justice. Third, they contend that the trial court lacked general jurisdiction over them because there is no evidence that any of the Mafco Defendants have continuous and systematic contacts with Texas such that they are essentially at home in Texas. Fourth and finally, the Mafco Defendants maintain that there is no sufficient basis for the trial court to exercise personal jurisdiction over them under a conspiracy, alter ego, or agency theory.

We begin our analysis of these issues by reviewing the principles of personal jurisdiction. We then identify the purported contacts of each of the Mafco Defendants so that we may determine whether Pepsi alleged sufficient facts against each defendant to bring it under the purview of the Texas long-arm statute. We then examine these contacts to determine whether the Mafco Defendants purposefully availed themselves of the privilege of conducting business in Texas. Finally, we consider whether traditional notions of fair play and substantial justice are offended by the exercise of personal jurisdiction over these defendants. After examining the principles of jurisdiction at play in this case and the jurisdictional facts alleged, we conclude that the trial court properly denied the Mafco Defendants' special appearances.

## I.  Standard of Review and Applicable Law

We review de novo a trial court's determination of a special appearance. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007). When, as here, the trial court does not make findings of fact and conclusions of law, all facts necessary to support the ruling and supported by the evidence are implied.

11

*Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 337 (Tex. 2009). Any implied findings are not conclusive and may be challenged under the well-settled standards for legal and factual sufficiency. *See Baker Hughes Inc. v. Brooks*, 405 S.W.3d 246, 249 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (citing *BMC Software Belg., N. V. v. Marchand*, 83 S.W.3d 789, 794–95 (Tex. 2002)). Here, the Mafco Defendants assert that the material facts are undisputed; thus they do not challenge the sufficiency of the evidence to support the trial court's implied findings.

The Texas long-arm statute authorizes Texas courts to exercise jurisdiction over a nonresident defendant who "does business" in the state. Tex. Civ. Prac. & Rem. Code Ann. § 17.042. The Supreme Court of Texas has interpreted the broad language of the Texas long-arm statute to extend Texas courts' personal jurisdiction "as far as the federal constitutional requirements of due process will permit." *BMC Software*, 83 S.W.3d at 795. A plaintiff bears the initial burden of pleading allegations sufficient to bring a nonresident defendant within the terms of the long-arm statute. *Id.* at 794–95. A defendant challenging a Texas court's personal jurisdiction over it must negate all jurisdictional bases alleged. *Id.*

A trial court may constitutionally exercise personal jurisdiction over a party when (1) the nonresident defendant has minimum contacts with the forum state and (2) the assertion of jurisdiction complies with traditional notions of fair play and substantial justice. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *Peters v. Top Gun Exec. Group*, 396 S.W.3d 57, 62 (Tex. App.—Houston [14th Dist.] 2013, no pet.). Minimum contacts are sufficient for personal jurisdiction when the nonresident defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws. *Retamco*, 278 S.W.3d at 338. "The defendant's activities, whether they

consist of direct acts within Texas or conduct outside Texas, must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court." *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002) (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980))

Texas courts may exercise two types of jurisdiction based on a nonresident's contacts with the state. General jurisdiction arises when a defendant's contacts with the forum state are "continuous and systematic." *Retamco*, 278 S.W.3d at 338–39. In analyzing specific jurisdiction, on the other hand, we focus on the relationship among the defendant, the forum, and the litigation. *Moki Mac*, 221 S.W.3d at 575–76. Specific jurisdiction is established if the defendant's alleged liability arises out of or is related to an activity conducted within the forum. *Id.* at 576. Here, because we determine that the exercise of specific jurisdiction over the Mafco Defendants is appropriate, we need not consider the Mafco Defendants' general jurisdiction issues.

## II. Pepsi's Jurisdictional Allegations

In their first issue, the Mafco Defendants challenge the trial court's denial of their special appearances because Pepsi relied on "jurisdictional allegations in a blanket fashion against all Mafco Defendants." When there are multiple defendants, each defendant's contacts with the forum must be assessed separately. *Citrin Holdings, LLC v. Minnis*, 305 S.W.3d 269, 279 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (citing *Calder v. Jones*, 465 U.S. 783, 790 (1984)). We look to Pepsi's pleadings and its response to the Mafco Defendants' special appearances to assess each of the Mafco Defendants' alleged contacts. *See Max Protech, Inc. v. Herrin*, 340 S.W.3d 878, 883 (Tex. App.—Houston [14th Dist.] 2011, no pet.).

Here, Pepsi's jurisdictional allegations contained in its petition consist predominately of blanket allegations against the "Mafco Defendants." In each of their special appearances, the Mafco Defendants asserted that the jurisdictional allegations in Pepsi's petition did not sufficiently identify to which particular Mafco entity the allegation was aimed. We agree that these jurisdictional allegations, for the most part, are not sufficient for a court to judge each of the individual Mafco entities' forum contacts. *See Calder*, 466 U.S. at 790 ("Each defendant's contacts with the forum must be assessed individually.").

But Pepsi additionally filed a response to the Mafco Defendants' special appearances, which, with its 97 attached exhibits, is nearly 4,000 pages long. *See Max Protech*, 340 S.W.3d at 883 (stating that we consider both the plaintiff's pleading and the response to a special appearance in assessing jurisdictional contacts). In its response, Pepsi makes multiple blanket assertions against the Mafco Defendants as a group. These assertions, however, are supported by references to attached exhibits, and we can determine to which specific Mafco entity these allegations refer or if the allegations may fairly be deemed to refer to all of the Mafco Defendants. And because there are no findings of fact and conclusions of law, we must imply all findings supported by the record to sustain the trial court's denial of the special appearances. *See Retamco*, 278 S.W.3d at 337. These more specific allegations are those that we examine to determine whether the trial court properly determined the jurisdictional question before it.

In short, because Pepsi provided sufficient evidence in its response to the Mafco Defendants' special appearances to allow a court to individually assess the Mafco Defendants' jurisdictional contacts, we overrule the Mafco Defendants' first issue.

### III.    Specific Jurisdiction

In their second issue, the Mafco Defendants assert that the trial court lacked specific jurisdiction over each of them. In this issue, they assert that they lacked sufficient minimum contacts with Texas, that there is no substantial connection between any of their Texas contacts and the operative facts of the litigation, and that allowing a Texas court to exercise specific jurisdiction over them would offend traditional notions of fair play and substantial justice. We address each of these assertions in turn below, concluding that the record supports the trial court's denial of the Mafco Defendants' special appearances because the exercise of specific jurisdiction over these defendants is appropriate.

#### A.    *Minimum Contacts*

For a Texas court to properly exercise specific jurisdiction in this case, (1) the Mafco Defendants must have made minimum contacts with Texas by purposefully availing themselves of the privilege of conducting activities here, and (2) their liability must have arisen from or be related to those contacts. *Moki Mac*, 221 S.W.3d at 576. The "touchstone" of jurisdictional due process is "purposeful availment." *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784 (Tex. 2005). Purposeful availment requires a defendant to seek some benefit, advantage, or profit by availing itself of the jurisdiction. *Id.* We thus consider the contacts alleged by Pepsi to determine whether any of the Mafco Defendants purposefully availed themselves of the privilege of conducting activities in Texas.

Pepsi alleges the following contacts in support of the trial court's exercise of specific jurisdiction over the Mafco Defendants:

- Steven Fasman, the corporate representative of the Mafco Defendants who, as described above, is employed in some capacity by each of the

15

individual Mafco entities involved in this litigation, traveled to Texas in 2006 to attend a meeting with Cooper representatives to discuss Plan A. This contact is shared by all the Mafco Defendants.[14]

- Representatives of the Mafco Defendants communicated about Plan A with "a person located in the State of Texas or who claimed to work in the State of Texas." These contacts are shared by all the Mafco Defendants.

- Mafco representatives acknowledged that they communicated remotely with a person either located in Texas or who claimed to work in Texas about Plan B. The Mafco Defendants acknowledged this same fact as to Plan C. These contacts are shared by all the Mafco Defendants.

- Numerous tolling agreements were executed by the Mafco Defendants and the Cooper companies during the negotiations of Plan C. MCG Holdings was not a party to any of these tolling agreements, but the rest of the Mafco Defendants were.

- In 2009, as described above, Fasman made two trips to Texas: one in February, where he was accompanied by MacAndrews' representative Barry Schwartz and an attorney, and another in November. These contacts were on behalf of MacAndrews, which is not a defendant here, and are otherwise shared by the Mafco Defendants.

---

[14] In his affidavits filed in support of the Mafco Defendants' special appearances, Fasman refers to all of the Mafco entities collectively as the "Mafco Defendants" and does not distinguish to which entity any of the facts he averred to relate. Because we imply all findings in favor of the trial court's denial of the special appearance, *see Retamco*, 278 S.W.3d at 337, where appropriate and supported by the record, we determine that Fasman's contacts with Texas were on behalf of all of the Mafco Defendants.

- Attorneys for MacAndrews & Forbes and Pneumo Abex emailed the first draft of the Plan C Agreement to a Cooper representative

- PCT International purposefully moved Pneumo Abex to Texas and transferred ownership of Pneumo Abex to the Trust.

- M&F Worldwide, PCT International, Mafco Worldwide, and Mafco Consolidated established the Trust, assisted in selecting Texas resident and former Cooper employee Keith Odenweller as the manager of Integra, knew Odenweller would run Integra, the Trust, and Pneumo Abex from Texas, coordinated with Odenweller in selecting office space, and trained Odenweller.

- M&F Worldwide agreed to assist the Trust and Integra for nine months in defending products claims; MCG Holdings agreed to provide consulting services to Integra for six months.

- M&F Worldwide, PCT International, Mafco Worldwide, and Mafco Consolidated transferred Pepsi's insurance assets and $15 million to either the Trust or Pneumo Abex. They shipped thousands of boxes of Pneumo Abex's records to Texas.

- The Trust owes indemnification obligations to M&F Worldwide, Mafco Worldwide, Mafco Consolidated, and PCT International.

Based on these alleged contacts, we conclude that the trial court properly concluded that the Mafco Defendants each purposefully availed themselves of the privilege of conducting activities in Texas for the following reasons.

17

### B. Operative Facts

"[F]or specific-jurisdiction purposes, purposeful availment has no jurisdictional relevance unless the defendant's liability arises from or relates to the forum contacts." *Moki Mac*, 221 S.W.3d at 579. For a nonresident defendant's forum contacts to support an exercise of specific jurisdiction, there must be a "substantial connection" between those contacts and the operative facts of the litigation. *Id.* at 584–88. The operative facts are those facts that would be the focus of the trial. *Id.* at 575; *see also Pulmosan Safety Equip. Corp. v. Lamb*, 273 S.W.3d 829, 839 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). "To identify the operative facts of the litigation, we look to the plaintiff's allegations." *Transportes de Zima Real S.A. de C.V. v. Lizarraga*, No. 14-13-00933-CV, 2014 WL 3512858, at *2 (Tex. App.—Houston [14th Dist.] July 15, 2014, no pet.) (mem. op.) (citing *Moki Mac*, 221 S.W.3d at 585).

In its response to the Mafco Defendants' special appearances, Pepsi identified the operative facts of the lawsuit as follows:[15]

> Here, [Pepsi] asserts claims for tortious interference, conversion, fraudulent transfer, and civil conspiracy against the Mafco defendants. The Mafco defendants interfered with the 1988 SPA between [Pepsi] and Pneumo Abex, converted [Pepsi]'s insurance assets, fraudulently transferred a lump-sum payment for a release of the Cooper and Mafco defense and indemnity obligations or conspired to do the same. All of these activities or their effects are continuing in nature, and are continuing in Texas. The operative facts of this lawsuit surround the Mafco and Cooper defendants' Plans A, B, and C schemes to extinguish their obligations to Pneumo Abex. These schemes and actions in concert with the Cooper defendants culminated in the Plan C Agreement. The Mafco defendants' Texas

---

[15] We need not assess contacts on a claim-by-claim basis if, as alleged here, all claims arise from the same forum contacts. *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150–51 (Tex. 2013).

contacts related to these schemes include: (1) the 2006 and 2009 Texas meetings; (2) the communications between the Mafco and Cooper defendants about Plans A, B, and C; (3) the negotiation and drafting of the Plan C Agreement; (4) performance of the Plan C Agreement; and (5) the selection of the Trustees and the selection of the manager of Integra.

These allegations identify the focus of this trial—i.e., the operative facts of the lawsuit—as concerning the negotiation, execution, and implementation of the Plan C Agreement, and its alleged effect on Pepsi's indemnification rights under the 1988 SPA. With this proper narrowing of the focus of the jurisdictional allegations at issue, we next consider the Mafco Defendants' alleged minimum contacts to determine whether they are substantially connected to the operative facts of this litigation. And again, because there are no findings of fact or conclusions of law, we must imply all findings supported by the record to uphold the trial court's denial of the Mafco Defendants' special appearances. *See Retamco*, 278 S.W.3d at 337.

### C. Mafco Defendants Purposefully Availed Themselves of the Privileges of Doing Business in Texas

As noted above, the Mafco Defendants traveled to Texas on three occasions: first in 2006, to discuss Plan A, and then twice in 2009, to discuss Plan C. We do not consider the 2006 meeting to discuss Plan A to be relevant to the operative facts of this lawsuit because there is nothing to indicate that Plan C arose from this meeting. *See, e.g.*, *Moki Mac*, 221 S.W.3d at 588. But the 2009 trips to Texas are, we believe, dispositive of the issue of whether the Mafco Defendants purposefully availed themselves of the privileges of doing business in Texas.

In *Moncrief Oil International, Inc. v. OAO Gazprom*,[16] the Supreme Court of Texas determined that a Texas court had jurisdiction over the nonresident defendant based largely on two meetings in Texas where trade secrets were alleged to have been exchanged. 414 S.W.3d at 147. The *Moncrief* Court further concluded that the nonresident defendants' contacts with Texas were neither "unilateral activities" nor "random and fortuitous" because the defendants agreed to attend Texas meetings and accepted the plaintiff's alleged trade secrets at those meetings. *Id.* at 154 (citing *Retamco*, 278 S.W.3d at 340). The Court explained that the nonresident defendants' contacts with Texas were purposeful because the defendants sought some "'benefit, advantage, or profit' by availing [themselves] of the forum." *Id.* (citing *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005)). Similarly, the Mafco Defendants' two meetings in Texas can fairly be construed as purposeful availment of the privileges of doing business in Texas for the following reasons.

First, as described above, after the February 2009 visit *to Texas* by Fasman and Schwartz, the negotiation of what became the Plan C Agreement ratcheted up. Although there was correspondence between the Cooper companies and the Mafco Defendants regarding possible scenarios through which their indemnification obligations and issues could be resolved prior to this meeting, *after* this meeting, the Mafco Defendants took the first concrete steps towards implementing Plan C: M&W Worldwide, on behalf of itself and its subsidiaries PCT International and Pneumo Abex, drafted and sent a letter to the IRS describing a potential lawsuit and resolution of the Mafco Defendants and the Cooper companies' disputes that

---

[16] The *Moncrief* Court concluded that the plaintiff's tortious interference claims, however, either arose from a meeting in California or the formation of a competing enterprise in Texas not subject to jurisdiction in the proceedings at bar, and thus a Texas court lacked jurisdiction over these claims. *Moncrief*, 414 S.W.3d at 147.

tracked the ultimate resolution of the New York litigation. And the record reflects that the Mafco Defendants "reached out" to the Cooper companies to begin these negotiations. These facts support an implied finding that, at the February 2009 meeting *in Texas* between the Mafco Defendants and the Cooper companies, the parties began formulating Plan C, a plan through which Pepsi alleges its rights under the 1988 SPA were impaired. *Cf. id.* at 156–57 (concluding that Texas court lacked specific jurisdiction over tortious interference claim in part because this claim arose from meetings in California, i.e., this claim was tantamount to "directing a tort at Texas from afar," which is insufficient to confer specific jurisdiction).

Further, hundreds of emails and telephone calls between the Mafco Defendants and the Cooper companies were exchanged after this meeting. Even if these contacts, standing alone, are insufficient to confer specific jurisdiction,[17] we consider the timing and content of these contacts show context for the Mafco Defendants' and the Cooper companies' collaboration to develop Plan C, a plan that can fairly be said to have been developed during a meeting in Texas. And as noted above, shortly after the second meeting *in Texas* in November 2009, M&F Worldwide drafted and sent a request for a letter ruling to the IRS regarding a proposed Texas resolution of the Mafco Defendants' and Cooper companies' alleged disputes over indemnification obligations. The trial court could have found that the Mafco Defendants and the Cooper companies further honed Plan C during this Texas meeting. Thus the record supports a finding that these Texas meetings were not "unilateral," "random," or "fortuitous." *See Moncrief*, 414 S.W.3d at 153. And although the Mafco Defendants denied any intent to commit these torts,

---

[17] *See Parex Resources, Inc. v. ERG Resources, LLC*, 427 S.W.3d 407, 426–27 (Tex. App.—Houston [14th Dist.] 2014, pet. filed) (stating that telephone calls and emails sent to Texas by non-resident defendant were insufficient to establish purposeful availment).

at the jurisdiction phase, we must examine business contacts, not what the parties thought or intended. *See id.* at 154. The record supports a finding that the Mafco Defendants attended two Texas meetings during which time a scheme was hatched and launched to interfere with Pepsi's contractual indemnification rights. *Cf. id.* at 153.

We are not persuaded by the Mafco Defendants' efforts to recast this case as an alleged New York tort that, at most, is directed at Texas. The Supreme Court of Texas has rejected personal jurisdiction based solely on the consequences of a tort committed in another forum that has repercussions in Texas. *See Michiana*, 168 S.W.3d at 790–91 ("Several problems arise if jurisdiction turns not on a defendant's contacts, but on where it 'directed a tort.'"); *see also Cerbone v. Farb*, 225 S.W.3d 764, 772 (Tex. App.—Houston [14th Dist.] 2007, no pet.) ("[I]n *Michiana*, the Texas Supreme Court expressly rejected personal jurisdiction based solely on the effects or consequences of an alleged tort committed in another forum that had repercussions in Texas."). But this case is not a "directed a tort" at Texas case; instead, as discussed above, this is a case where the record supports a finding that an integral part of the tort alleged occurred in Texas. *See* Tex. Civ. Prac. & Rem. Code Ann. § 17.042(2) (nonresident does business in Texas when it commits a tort in whole or in part in Texas). And the fact that the schemes hatched at these Texas meetings resulted in further contacts by and between Texas and the Mafco Defendants strengthens the Mafco Defendants' ties to Texas. For example, prior to executing the Plan C Agreement, Fasman was aware that Integra was going to be located in Texas and run by a Texas resident. Fasman was further aware that Integra would be managing the Trust, which in turn was to be the sole shareholder of Pneumo Abex after closing of the Plan C Agreement. Finally, after closing of the agreement. M&F Worldwide agreed to assist the Trust and Integra for nine

months in defending products claims; MCG Holdings agreed to provide consulting services to Integra for six months; M&F Worldwide, PCT International, Mafco Worldwide, and Mafco Consolidated transferred Pepsi's insurance assets and $15 million to either the Trust or Pneumo Abex; the Mafco Defendants shipped thousands of boxes of Pneumo Abex's records to Texas; and the Trust owes indemnification obligations to M&F Worldwide, Mafco Worldwide, Mafco Consolidated, and PCT International. These Texas contacts show a continuing course of dealing under the terms of the Plan C Agreement that supports an inference that the Plan C Agreement, although executed in New York, was to be performed in Texas. *Cf. Citrin*, 305 S.W.3d at 283 ("Here, . . . the circumstances involve multiple Texas contacts over many months in the course of an ongoing relationship that 'was not unilaterally initiated by the Texas resident.' These circumstances demonstrate Citrin's purposeful contact with Texas along with an intent to obtain benefits from these contacts." (citations omitted)).

Finally, there can be no dispute that the Mafco Defendants gained a benefit from severing their relationships with Pneumo Abex and transferring their Pneumo Abex responsibilities to Texas. After attending two meetings in Texas with Texas residents (Cooper Industries and Cooper U.S.), they relieved themselves of a long-term indemnity obligation owed by one of their corporate subsidiaries and gained indemnification for these same obligations from a newly created trust—managed by Texas resident Integra—that became the sole shareholder of their former subsidiary. *See Moncrief*, 414 S.W.3d at 154. The Mafco Defendants entered into the Plan C Agreement, including the ancillary agreements, with the Cooper companies and contractually avoided Texas as a forum for suits arising from those agreements by including forum selection clauses specifying New York or Delaware in the agreements. But the Mafco Defendants entered into agreements to

23

create and perpetuate a Trust located in and operating in the State of Texas, though legally formed in Delaware. No doubt, the Mafco Defendants have negotiated to contractually avoid Texas as a forum available for disputes between the parties to the Plan C Agreement because Texas would otherwise exist as a forum for suit. However, the Mafco Defendants may not unilaterally and as a matter of law render their Texas contacts meaningless through forum selection clauses in contracts to which Pepsi is not a party. Rather, we consider the evidence that the Mafco Defendants initiated a complex plan while in Texas meeting with Texas residents. We consider that the Mafco Defendants refined that complex plan—a plan alleged here to be tortious interference—through hundreds of emails to Texas to the Cooper companies and others who would carry out the agreements necessary to implement the Plan C Agreement. We consider that the Mafco Defendants divested themselves of Pneumo Abex to a trust operating in Texas and owing continuing obligations to the Mafco Defendants. We thus conclude that, rather than seeking to avoid Texas, the Mafco Defendants "sought out Texas and the benefits and protections of its laws." *Id.*

## D. *Fair Play and Substantial Justice*

In addition to sufficient minimum contacts, due process requires the exercise of personal jurisdiction to comply with traditional notions of fair play and substantial justice. *Retamco*, 278 S.W.3d at 338. When a nonresident has minimum contacts with the form, the exercise of jurisdiction over the nonresident rarely offends traditional notions of fair play and substantial justice. *Moncrief*, 414 S.W.3d at 154–55 (citing *Retamco*, 278 S.W.3d at 338). In evaluating this component of personal jurisdiction, we consider the following factors: (1) the burden on the defendant; (2) the interests of the forum in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the

interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies. *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 232 (Tex. 1991).

First, subjecting these nonresident defendants to suit in Texas surely imposes a burden on them, but the same can be said of all nonresidents. "Distance alone cannot ordinarily defeat jurisdiction." *Moncrief*, 414 S.W.3 at 155 (citing *Spin Star AG v. Kimich*, 310 S.W.3d 868, 879 (Tex. 2010)). Given the Mafco Defendants' meetings with the Cooper companies in Texas and their agreement to effectively transfer their indemnification obligations to Texas, the burden of litigating in Texas is not so severe as to defeat jurisdiction. *Cf. id.* (concluding that familiarity with forum through meetings in Texas and legal system of Texas by setting up a subsidiary headquartered in Texas militated against defeating personal jurisdiction based on burden on defendants). Further, because Pepsi's claims against the other defendants, which arise out of the same facts as its claims against the Mafco Defendants, will be heard in Texas, it is more efficient to adjudicate the entire case in the same place. *See Spin Star*, 310 S.W.3d at 879. Finally, the fact that Pepsi has alleged that the Mafco Defendants have committed a tort in whole or in part in Texas implicates a state interest in adjudicating this dispute. *See Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 766 (1984) ("A state has an especial interest in exercising jurisdiction over those who commit torts within its territory.").

We conclude that, on balance, asserting personal jurisdiction over the Mafco Defendants would not offend traditional notions of fair play and substantial justice. We thus overrule the Mafco Defendants' second issue.

## CONCLUSION

We have addressed the dispositive issues in this appeal and determined that the trial court did not err by denying the Mafco Defendants' special appearances. And because we have concluded that the trial court's denial of the Mafco Defendants' special appearances based on specific jurisdiction was proper, we need not reach their other issues regarding general jurisdiction. We affirm the trial court's order denying the Mafco Defendants' special appearances.


/s/    Sharon McCally
Justice

Panel consists of Justices Christopher, Jamison, and McCally.