

NUMBER 13-14-00310-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

GRAY, RITTER & GRAHAM,
PC; WOLF HALDENSTEIN
ADLER FREEMAN & HERZ, LLC;
NEBLETT BEARD & ARSENAULT, LLP;
DON M. DOWNING; AND
ADAM J. LEVITT,                                                  Appellants,

v.

GOLDMAN PHIPPS PLLC
F/K/A GOLDMAN PENNEBAKER
& PHIPPS, PC; MIKAL C. WATTS,
PC; AND MURRAY LAW FIRM,                                         Appellees.

On appeal from the County Court at Law No. Two
of Nueces County, Texas.

# OPINION

**Before Justices Benavides, Perkes, and Longoria**
**Opinion by Justice Longoria**

Appellants, Gray, Ritter & Graham, P.C. ("GRG"), Wolf Haldenstein Adler Freeman & Herz LLC ("WHAFH"), Neblett Beard & Arsenault LLP ("NBA"), Don M. Downing, and Adam J. Levitt, appeal the trial court's denial of their special appearances. Appellants served as leadership counsel representing the plaintiffs in multidistrict litigation in federal court against Bayer CropScience L.P. and other entities (collectively "Bayer") based on the escape of genetically modified rice into the nation's rice crops. Appellees, Goldman Phipps, PLLC f/k/a Goldman Pennebaker & Phipps, P.C., Mikal C. Watts, P.C., and Murray Law Firm also represented plaintiffs bringing claims against Bayer, however, their cases were generally filed in Texas and other state courts rather than in the federal multidistrict litigation case. Appellants claim that appellees owe them attorney's fees from a settlement that appellees reached with Bayer in the state court cases. In the underlying proceeding, appellees filed a declaratory judgment action against appellants to construe appellants' rights to the fees under the state court settlement agreement.

After examining the principles of jurisdiction at issue in this case and the jurisdictional evidence provided by the parties, we affirm the trial court's order denying appellants' special appearances on grounds that the appellants purposefully availed themselves of the privilege of conducting activities in Texas and their liability arose from or was related to those contacts.

## I. BACKGROUND

In August of 2006 and March of 2007, the United States Department of Agriculture announced that two unapproved genetically modified varieties of rice developed by Bayer had escaped from Bayer's test plots into the nation's rice crops. As a result, thousands

2

of rice farmers, land owners, and rice producers in the five main rice-producing states, Texas, Arkansas, Louisiana, Mississippi, and Missouri, brought suit against Bayer for their damages. The United States Judicial Panel on Multidistrict Litigation transferred and consolidated the cases that had been filed in or removed to federal court into a single federal multi-district case in the United States District Court for the Eastern District of Missouri before the Honorable Catherine D. Perry (the "genetically modified rice MDL").

After receiving and reviewing various proposals from law firms who wished to serve as leadership counsel for the plaintiffs in the genetically modified rice MDL, Judge Perry appointed Downing from the law firm of GRG, and Levitt, who at that time was a partner with WHAFH, to serve as co-lead counsel for all of the plaintiffs. Judge Perry appointed Arsenault of NBA to serve on the plaintiffs' executive committee. Judge Perry directed co-lead counsel and the plaintiffs' executive committee (collectively referred to as the leadership group or the common benefit attorneys), to act on behalf of all plaintiffs in the genetically modified rice MDL in prosecuting the case.[1] The leadership group engaged in discovery, including taking over 150 depositions, retained experts, and handled dispositive motions. The leadership group picked groups of plaintiffs from each state for "bellwether" trials to be held in St. Louis, Missouri.[2] The leadership group conducted the trials, three of which resulted in verdicts for the plaintiffs, and a fourth trial which settled after the first week. The fourth bellwether trial, which settled, featured Texas plaintiffs.

---

[1] According to the order appointing leadership counsel, the Plaintiffs' Executive Committee was composed of Arsenault and Scott E. Poynter of Emerson Poynter LLP; Stephen A. Weiss of Seeger Weiss LLP; Joe R. Whatley, Jr. of Whatley Drake & Kallas LLC; William Chaney of Looper, Reed & McGraw, P.C.; and Ralph E. Chapman of Chapman Lewis & Swan.

[2] A "bellwether" trial is used to assess whether a class should be certified or to assess a claim's value for settlement purposes. *In re FEMA Trailer Formaldehyde Products Liab. Litig.*, 628 F.3d 157, 159 n.1 (5th Cir. 2010).

While the genetically modified rice MDL proceeded in federal court, other cases against Bayer remained in state courts and were prosecuted in essentially parallel litigation by appellees in Texas, Arkansas, and Louisiana. Appellees represented approximately 5,000 of the plaintiffs in the state court litigation and also represented some of the clients who had claims pending in the federal MDL.[3] In the state court litigation, appellees conducted discovery, including taking over 120 state court depositions, and handled dispositive motions. Appellees tried two of the state court cases to verdict, one of which constituted the first punitive damage verdict and the highest overall per-acre award against Bayer.

After the bellwether trials in the genetically modified rice MDL and the two state court trials, Bayer offered to settle all claims against it, in both the federal MDL proceeding and the state court claims, through a global settlement totaling $750 million. Bayer wished to buy "global peace," and thus all claims against it, whether filed in the federal MDL or in state court, had to be settled for the total amount in order for the settlement to be effectuated. In order to accomplish the global settlement, Bayer entered into two separate settlement agreements. One of the settlement agreements, the genetically modified rice MDL settlement agreement, related exclusively to plaintiffs whose cases were included in the federal rice MDL, for which the appellants served as the leadership group. The second settlement agreement, the GMB[4] state court settlement agreement, resolved the claims of state court litigants who were appellees' clients.

---

[3] Appellees' clients in the MDL included 251 Texas rice farming operations who had originally filed their claims in Texas state court; however, those claims were removed to federal court and ultimately transferred into the genetically modified rice MDL.

[4] The GMB state court settlement agreement appears to be titled as such based on the names of the plaintiffs' law firms participating in the agreement. According to the initial recital in the agreement, it "is entered into by and among (i) Bayer, (ii) each of Goldman, Pennebaker and Phipps, P.C. ("GPP"), Mikal C.

4

Watts testified that the GMB state court settlement was negotiated first. According to Watts, appellants were not signatories on the GMB state court settlement agreement, however, they were "involved" in that settlement. Watts testified that Bayer would not agree to settle any claims against it unless the plaintiffs in both the MDL and state court cases agreed to settle for the total sum of $750 million. "And so the different parties had to, in effect, approve the other settlement because there was money moving around between the two." Watts testified that appellants "got to be the signatories on the MDL settlement" and "[w]e got to be the signatories on the GMB settlement." Watts testified that "there was plenty [of] back and forth about what should be in each after the original deal was done."

The funds for the GMB state court settlement were structured through a qualified settlement fund agreement." The purpose of the fund was to "accept, hold and distribute funds" paid by Bayer in consideration of the settlement of all claims against Bayer and a full and final release. According to the qualified settlement fund agreement:

> Allocation issues exist as to the settlement, including but not limited to allocation among the plaintiffs and various attorneys, payment of fees and litigation expenses, potential liens and other unresolved matters. It is the best interests of the Plaintiffs that the money be paid into a Fund which earns income rather than held by [Bayer] while those issues are being resolved.
>
> . . . .
>
> . . . To the extent that there is any dispute of the administration and payouts to be made by this fund, or need for a court order to terminate this fund, such matters shall be resolved by a suit being filed in the county courts at law of Nueces County, Texas, and such Court shall have exclusive jurisdiction over any disputes as to the administration and pay outs to be made by this Fund, and any issues concerning the termination of this fund.

Watts, P.C. ("MCWPC"), Chuck Banks ("Banks") and the Murray Law Firm ("Murray") (collectively referred to herein as "GMB") and (iii) each GMB Client who is bound by this Agreement according to its terms."

After their appointment and during the pendency of the federal MDL case, the leadership group had requested Judge Perry to establish a common benefit fund[5] on grounds that the leadership group had, to that date, incurred $20,000,000 in fees in prosecuting the rice MDL. They requested that Judge Perry set aside eleven percent of the overall recovery of all of the rice litigants, both federal MDL plaintiffs and state court plaintiffs, and pay that amount into the common benefit fund. Bayer and appellees objected to that request. In February of 2010, Judge Perry issued an order instructing Bayer to withhold 11% of the funds to be paid to the federal MDL plaintiffs and to place those funds into a common benefit fund as both attorneys' fees and compensation for courts costs incurred by the federal MDL plaintiffs' lawyers, including the leadership group. The court ordered a disbursement of up to seventy-two million dollars to the leadership group and the other attorneys and firms who worked with them. While the leadership group had also requested Judge Perry to order Bayer to withhold a portion of the state court GMB settlement for the same purpose, Judge Perry denied that request. Both groups of attorneys appealed, and the Eighth Circuit affirmed. *In re Genetically Modified Rice Litig.*, 764 F.3d 864, 873–74 (8th Cir. 2014), *cert. denied*, 135 S.Ct. 1455 (Feb. 23, 2015); *see also Downing v. Goldman Phipps PLLC*, No. 4:13CV206 CDP, 2015

---

[5] Under the "American Rule" pertaining to the award of attorneys' fees, the prevailing litigant is ordinarily not entitled to collect a reasonable attorney's fee from the losing litigant. *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 561 (1986). Likewise, the attorney for the prevailing litigant must generally look to his or her own client for payment of attorneys' fees. *See id.*; *In re Vioxx Products Liab. Litig.*, 760 F. Supp. 2d 640, 647 (E.D. La. 2010). The "common benefit" doctrine provides an equitable exception to the American Rule that permits the creation of a common fund in order to pay reasonable attorneys' fees for legal services beneficial to persons other than a particular client, thus spreading the cost of the litigation to all beneficiaries. *See In re Zyprexa Prods. Liab. Litig.*, 594 F.3d 113, 128 (2d Cir. 2010) (Kaplan, J., concurring). This equitable exception was originally most commonly applied to awards of attorneys' fees in class actions; however, the common benefit concept has migrated into multidistrict litigation. *In re Vioxx Products Liab. Litig.*, 760 F. Supp. 2d at 647. "The theoretical bases for the application of this concept to MDLs are the same as for class actions, namely equity and her blood brother, quantum meruit. However, there is a difference. In class actions the beneficiary of the common benefit is the claimant; in MDLs the beneficiary is the primary attorney." *See id.*

WL 3971054, at *1 (E.D. Mo. June 30, 2015). The Eighth Circuit held, inter alia, that the MDL court acted within its discretion in awarding fees and expenses to lead counsel; that the MDL court acted within its discretion in declining to award fees to non-lead attorneys; and that the MDL court did not have power to order parties in cases not before it to contribute to the settlement fund. *See id.*

Between July of 2010 and May of 2011, the leadership group attempted to intervene in multiple state court proceedings in Arkansas and Louisiana to claim a portion of the money due to the plaintiffs in those cases on grounds that the state court attorneys utilized the leadership group's common benefit work to prosecute their own state court claims. The leadership group's attempts at intervention were either abandoned or denied by the state courts.[6]

Appellees subsequently filed the underlying declaratory judgment action in County Court at Law No. Three of Nueces County, Texas, as contemplated by the GMB settlement agreement and the qualified settlement fund agreement, against appellants and others to construe the rights of the parties to the attorneys' fees and expenses under the GMB state court settlement agreement.[7] The jurisdictional allegations in the appellees' second amended petition are as follows:

---

[6] After this declaratory judgment action was filed, Downing and Levitt filed a putative class action in the Eastern District of Missouri against appellees for unjust enrichment and quantum meruit, arguing that the appellees in this case used common benefit materials and services developed by the Federal MDL lawyers in appellees' state courts actions but refused to pay them. The trial court dismissed the case for lack of personal jurisdiction, but the Eighth Circuit reversed. *Downing v. Goldman Phipps, PLLC*, 764 F.3d 906, 908 (8th Cir. 2014), *cert. denied*, 135 S.Ct. 1464 (Feb. 23, 2015).

[7] Plaintiffs' second amended petition for declaratory judgment was brought against appellants and Seeger Weiss LLP, Emerson Poynter LLP, Whatley Drake & Kallas LLP, Looper Reed & McGraw, P.C., and Chapman, Lewis & Swan, P.L.L.C. Defendants Whatley Drake & Kallas, LLP, Chapman Lewis & Swan, and Seeger Weiss, LLP initially filed special appearances, but withdrew them before the hearing. Defendants Looper Reed & McGraw, P.C. and Emerson Poynter LLP did not file special appearances.

10.     The amount in controversy exceeds this Court's minimum jurisdictional requirement.  Defendants seek attorney's fees and expenses based on settlement monies paid, or that will be paid, for the claims of Plaintiffs' clients into the [qualified settlement fund], which is domiciled and administered in Nueces County, Texas.  Plaintiffs contend Defendants are entitled to no share of the funds paid pursuant to the GMB Settlement Agreement and seek attorney's fees . . . .

11.     Although not all Defendants are Texas residents, this Court has both general and specific personal jurisdiction over Defendants.  First, Defendants, who are all law firms or attorneys, have had continuous and systematic contacts with Texas, when considering the litigation arising from [the genetically modified rice litigation] (both federal MDL and non-MDL proceedings) and the representation of other Texas clients unrelated to the [genetically modified] rice litigation.  Second, Defendants have purposefully availed themselves to the privilege of conducting business in Texas, continue to conspire to commit acts affecting Texas residents, and have committed acts outside of Texas that have reasonably foreseeable consequences in Texas.  Defendants have sufficient minimum contacts with Texas to confer jurisdiction on Texas courts, including but not limited to:

a.     Contracting for the legal representation of Texas clients;

b.     Requesting the creation of a common benefit fund (related to Plaintiffs' Texas clients and the Texas clients of other attorneys governed by the federal MDL proceeding) and then requesting a distribution of $72 million in attorney's fees, some of which originated from the recoveries of Plaintiffs' Texas clients and other attorneys' Texas clients governed by the federal MDL proceeding;

c.     Authorizing, employing, and/or directing agents, including, but not limited to, other Texas attorneys, to perform legal services on behalf of federal MDL clients, some of which are Texas clients, and then seeking recovery of attorney's fees performed by these Texas law firms as "common benefit" work;

d.     Maintaining a website, www.bayerricelitigation.com, to solicit clients from Texas and other states in the federal MDL proceeding and in the pendant non-MDL state proceedings;

e.     Seeking payment from Texas attorneys, including Plaintiffs, arising out of the representation of Texas clients who fell within and outside the federal MDL proceeding; Defendants purposefully availed themselves of the privilege of conducting activities within Texas and seek monetary benefit from those activities.

8

f. Defendants [Downing and Levitt], individually, have now in fact filed a class action lawsuit against Plaintiffs Goldman Phipps PLLC f/k/a Goldman, Pennebaker & Phipps, PC and Mikal C. Watts PC seeking attorney's fees in the United States District Court, Eastern District of Missouri.[footnote omitted]

g. Defendants sought intervention into Plaintiffs' cases pending in the state courts of Arkansas and Louisiana. After seeking intervention, Defendants threatened to sue Texas lawyers seeking an award for the payment of attorney's fees from Plaintiffs' [qualified settlement fund], which specifically sets forth that all disputes over disbursements from that [qualified settlement fund] be adjudicated in Nueces County, Texas.

12. Further, diversity does not exist because two Plaintiffs — Goldman Phipps PLLC and Mikal C. Watts, PC — are Texas citizens and Defendant Looper Reed & McGraw is a Texas citizen.

Appellants filed special appearances and amended special appearances contending that the trial court lacked jurisdiction over them, and appellees filed responses thereto. After the parties filed additional briefing, the trial court held an evidentiary hearing on the special appearances. At the hearing, appellants argued generally that they were not subject to general jurisdiction or specific jurisdiction in Texas because: the genetically modified rice litigation was litigated in Missouri; the common benefit fund was located in Missouri; appellants were not parties to the GMB state court settlement agreement or the qualified settlement fund, both of which were created by the unilateral actions of appellees; appellants had not filed suit in Texas to recover any fees from the appellees or from the qualified settlement fund; appellants were not "at home" in Texas for purposes of general jurisdiction; appellants did not utilize any Texas agents to perform work on the genetically modified rice MDL; the appellants' website pertaining to the MDL was not interactive; and any attorney-client relationships that they had with Texans pertained to litigation outside of Texas. In contrast, appellees argued, in relevant part, that: appellants were seeking access to attorney's fees from the GMB state court settlement and the

9

qualified settlement fund located in Nueces County, Texas; appellants were asserting a right to benefit from contractual agreements between Texas attorneys and Texas clients; and appellants were awarded substantial financial gains in the form of attorney's fees in the federal rice MDL as a result of the claims of Texas residents.

The trial court denied the appellants' special appearances and did not enter findings of fact and conclusions of law. This appeal ensued. By one issue, appellants contend that the trial court erred in denying their special appearances because: (a) appellants' contacts with Texas are not "constant and pervasive" so as to render them "essentially at home" in this state, so general jurisdiction does not exist under the United State Supreme Court's opinion in *Daimler AG v. Bauman*, 134 S. Ct. 746, 187 L. Ed. 2d 624, 82 USLW 4043 (Jan. 14, 2014); (b) specific jurisdiction does not exist because appellees' declaratory judgment action does not arise out of, or relate to, appellants' contacts with the State of Texas; and (c) even if appellants have sufficient minimum contacts to support specific or general jurisdiction in Texas, the exercise of jurisdiction here would violate the traditional notions of fair play and substantial justice.

## II. STANDARD AND SCOPE OF REVIEW

Whether a trial court has personal jurisdiction over a nonresident defendant is a question of law. *Moncrief Oil Int'l Inc. v. OAO Gazprom Exp., LLC*, 414 S.W.3d 142, 150 (Tex. 2013); *Michiana Easy Livin' Country, Inc. v. Holten*, 168 SW.3d 777, 790–91 (Tex. 2005); *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). Accordingly, we perform a de novo review of the trial court's ruling on the a special appearance. *Moncrief,* 414 S.W.3d at 150; *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007); *BMC Software*, 83 SW.3d at 794. However, the trial court

10

must frequently resolve questions of fact before deciding the jurisdictional question. *BMC Software*, 83 SW.3d at 794; *Capital Tech. Info. Servs., Inc. v. Arias & Arias, Consultores*, 270 SW.3d 741, 748 (Tex. App.—Dallas 2008, pet. denied) (en banc); *Preussag Aktiengesellschaft v. Coleman*, 16 S.W.3d 110, 113 (Tex. App.—Houston [1st Dist.] 2000, pet. dism'd w.o.j.). In this regard, the trier of fact is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *WA DC Party Shuttle, LLC v. IGuide Tours, LLC*, 406 S.W.3d 723, 729 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (en banc); *Xenos Yuen v. Fisher*, 227 S.W.3d 193, 201 (Tex. App.—Houston [1st Dist.] 2007, no pet.) *Huynh v. Nguyen*, 180 S.W.3d 608, 615 (Tex. App.—Houston [14th Dist.] 2005, no pet.).

When a trial court does not issue findings of fact or conclusions of law, as in this case, "all facts necessary to support the judgment and supported by the evidence are implied." *BMC Software*, 83 S.W.3d at 795; *see Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 337 (Tex. 2009). However, because the appellate record includes the reporter's and clerk's records, the trial court's implied findings are not conclusive and may be challenged for legal and factual sufficiency. *BMC Software*, 83 S.W.3d at 795. We will affirm the trial court's ruling on any legal theory that finds support in the record. *Dukatt v. Dukatt*, 355 S.W.3d 231, 237 (Tex. App.—Dallas 2011, pet. denied).

We analyze the propriety of a special appearance on the basis of "the pleadings, any stipulations made by and between the parties, such affidavits and attachments as may be filed by the parties, the results of discovery processes, and any oral testimony." TEX. R. CIV. P. 120a(3); *see Camac v. Dontos*, 390 S.W.3d 398, 405 (Tex. App.—Dallas

11

2012, no pet.). On appeal, the scope of review in a special appearance case includes all evidence in the record. *Dodd v. Savino*, 426 S.W.3d 275, 284 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *Horowitz v. Berger*, 377 S.W.3d 115, 122 (Tex. App.—Houston [14th Dist.] 2012, no pet.). We do not address the merits of the lawsuit when we review an order denying a special appearance. *See Michiana*, 168 S.W.3d at 791–92; *Pulmosan Safety Equip. Corp. v. Lamb*, 273 S.W.3d 829, 839 (Tex. App.—Houston [14th Dist.] 2008, pet. denied); *Petrie v. Widby*, 194 S.W.3d 168, 175 n. 2 (Tex. App.—Dallas 2006, no pet.).

### III. BURDEN OF PROOF

The plaintiff and the defendant bear "shifting burdens of proof" in a challenge to personal jurisdiction. *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010). The plaintiff bears the initial burden of pleading sufficient allegations to bring a nonresident defendant within the provisions of the Texas long-arm statute. *Moncrief*, 414 S.W.3d at 149; *Kelly*, 301 S.W.3d at 658; *Moki Mac*, 221 S.W.3d at 574. When the plaintiff's initial burden is met, the burden shifts to the defendant who then has the burden of negating all bases of jurisdiction alleged in the plaintiff's petition. *Kelly*, 301 S.W.3d at 657–58; *Moki Mac*, 221 S.W.3d at 574.

The nonresident defendant can negate jurisdiction on either a factual or a legal basis. *Kelly*, 301 S.W.3d at 659. To negate jurisdiction on a factual basis, the nonresident defendant can disprove the plaintiff's allegations by presenting evidence that it has no contacts with Texas. *Id.* The plaintiff can respond with its own evidence affirming the allegations and risks dismissal if it cannot present the trial court with evidence establishing jurisdiction. *Id.* To negate jurisdiction on a legal basis, the nonresident defendant can

12

show that the evidence is legally insufficient to establish jurisdiction even if the plaintiff's allegations are true. *Id.* For example, the defendant can show that its contacts with Texas fall short of purposeful availment, that the plaintiff's claims do not arise from or relate to the contacts, or that exercising jurisdiction would offend traditional notions of fair play and substantial justice. *Id.*

## IV. JURISDICTION

A defendant makes a special appearance for the purpose of objecting to the court's jurisdiction over the defendant's person or property on the basis that the defendant or the defendant's property is not amenable to process in this state. *See* TEX. R. CIV. P. 120a(1). The concept of personal jurisdiction flows from the Due Process Clause of the Fourteenth Amendment to the United States Constitution and refers to the court's power to bind a particular person or party to a judgment. *CSR Ltd. v. Link*, 925 S.W.2d 591, 594 (Tex. 1996); *see* U.S. CONST. amend. XIV, §1. Texas courts may exercise personal jurisdiction over a nonresident if: (1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction is consistent with federal and state constitutional due-process guarantees. *Moncrief*, 414 S.W.3d at 149; *Moki Mac*, 221 S.W.3d at 574; *see Retamco*, 278 S.W.3d at 337; *accord Schlobohm*, 784 S.W.2d at 356. The Texas long-arm statute provides:

> In addition to other acts that may constitute doing business, a nonresident does business in this state if the nonresident:
>
> (1) contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state;
>
> (2) commits a tort in whole or in part in this state; or
>
> (2) recruits Texas residents, directly or through an intermediary located in this state, for employment inside or outside this state.

13

TEX. CIV. PRAC. & REM. CODE ANN. § 17.042 (West, Westlaw through 2015 R.S.). The Texas long-arm statute extends Texas courts' personal jurisdiction "as far as the federal constitutional requirements of due process will permit." *PHC–Minden, L.P. v. Kimberly–Clark Corp.*, 235 S.W.3d 163, 166 (Tex. 2007) (quoting *U–Anchor Adver., Inc. v. Burt*, 553 S.W.2d 760, 762 (Tex. 1977)). Thus, assuming personal jurisdiction over a nonresident defendant comports with due process when: (1) the nonresident defendant has minimum contacts with the forum state, and (2) asserting jurisdiction complies with traditional notions of fair play and substantial justice. *Moncrief*, 414 S.W.3d at 150; *accord Retamco*, 278 S.W.3d at 338; *see Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). A defendant establishes minimum contacts with a forum when it "purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Moncrief*, 414 S.W.3d at 150. In this regard, "what the parties thought, said, or intended is generally irrelevant to their jurisdictional contacts." *Id.* at 147.

A nonresident's contacts can give rise to general or specific personal jurisdiction. *Id.*; *see Zinc Nacional, S.A. v. Bouche Trucking, Inc.*, 308 S.W.3d 395, 397 (Tex. 2010). General jurisdiction involves a court's ability to exercise jurisdiction over a nonresident's claim regardless of whether the claim is related to the defendant's contacts with the state. *PHC–Minden*, 235 S.W.3d at 168. General jurisdiction exists when the nonresident's contacts with the state are continuous and systematic. *Moncrief*, 414 S.W.3d at 150; *Retamco*, 278 S.W.3d at 338–39. In contrast, specific jurisdiction exists when the cause of action arises from or is related to the nonresident's purposeful activities in the state. *Moncrief*, 414 S.W.3d at 150.

**A. GENERAL JURISDICTION**

14

If the defendant has made continuous and systematic contacts with the forum, general jurisdiction is established whether or not the defendant's alleged liability arises from those contacts. *Moki Mac*, 221 S.W.3d at 575; *BMC Software*, 83 S.W.3d at 796. General jurisdiction is "dispute-blind," as it permits the court to "exercise jurisdiction over a nonresident defendant based on any claim, including claims unrelated to the defendant's contacts with the state." *PHC–Minden*, 235 S.W.3d at 168; *see Nat'l Fire Ins. Co. of Hartford v. CE Design, Ltd.*, 429 S.W.3d 806, 812 (Tex. App.—Dallas 2014, no pet.). Thus, general jurisdiction involves a "more demanding minimum contacts analysis" than is involved in specific jurisdiction and has a "substantially higher" threshold. *PHC–Minden*, 235 S.W.3d at 168; *see CRS Ltd.*, 925 S.W.2d at 595. "Usually, 'the defendant must be engaged in longstanding business in the forum state, such as marketing or shipping products, or performing services, or maintaining one or more offices there; activities that are less extensive than that will not qualify for general in personam jurisdiction.'" *PHC–Minden*, 235 S.W.3d at 168 (quoting 4 WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1067.5).

In conducting a general-jurisdiction analysis, we are concerned with the quality rather than the quantity of the contacts, and the defendant's pre-suit contacts are the only relevant contacts. *See id.* at 169; *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 809–10 (Tex. 2002). In assessing the quality of the contacts, we do not view each contact in isolation; rather, we carefully investigate, compile, sort, and analyze all contacts to determine if together they are proof of a pattern of continuing and systematic activity that is sufficient to support general jurisdiction. *Coleman*, 83 S.W.3d at 809;

*Schlobohm*, 784 S.W.2d at 359; *see Parex Res., Inc. v. ERG Res., LLC*, 427 S.W.3d 407, 417 (Tex. App.—Houston [14th Dist.] 2014, pet. filed).

As the United States Supreme Court recently explained, a court has general jurisdiction when the nonresident defendant's affiliations with the state in which suit is brought "are so constant and pervasive" as to render the nonresident defendant "essentially at home in the forum State." *Daimler AG*, 134 S.Ct. at 751 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S.Ct. 2846, 2854, 2851, 2857, 180 L.Ed.2d 796 (2011)). In *Daimler*, the United States Supreme Court for the first time addressed the question of whether, consistent with due process, "a foreign corporation may be subjected to a court's general jurisdiction based on the contacts of its in-state subsidiary." 134 S.Ct. at 759. The Court held that, assuming without deciding that such contacts may in some circumstances be imputed to the foreign parent, a corporation may nonetheless be subject to general jurisdiction in a state only where its contacts are so "continuous and systematic," judged against the corporation's national and global activities, that it is "essentially at home" in that state. *Id.* at 761–62; *see Goodyear Dunlop*, 131 S.Ct. at 2851. The Court explained that a corporation is generally "at home," and thus subject to general jurisdiction, in a state that is the company's formal place of incorporation or its principal place of business, however, in "an exceptional case," there is the "possibility" that a corporation may be "at home" in places outside of its place of incorporation or principal place of business. *See Daimler AG*, 134 S.Ct. at 751, 761 n.19. The Court, reversing the Ninth Circuit's determination that general jurisdiction was appropriately exercised over a German corporation based on the California contacts of its Delaware and New Jersey-based subsidiary, expressly warned against the "risks to international

16

comity" of an overly expansive view of general jurisdiction that is inconsistent with "the 'fair play and substantial justice' due process demands." *Id.* at 763 (quoting *Int'l Shoe*, 326 U.S. at 316).

## B. SPECIFIC JURISDICTION

For a Texas court to properly exercise specific jurisdiction, the defendants must have made minimum contacts with Texas by purposefully availing themselves of the privilege of conducting activities here, and their liability must have arisen from or be related to those contacts. *Moki Mac*, 221 S.W.3d at 576. The "touchstone" of jurisdictional due process is "purposeful availment." *Michiana*, 168 S.W.3d at 784. The nonresident defendant must take action that is purposefully directed at the forum state. *Moki Mac*, 221 S.W.3d at 577. To determine whether the nonresident defendant purposefully directed action toward Texas, we examine the nonresident defendant's conduct indicating an intent or purpose to serve the Texas market. *Id.*

We apply a three-factor test to determine whether a nonresident purposefully availed itself of the privilege of conducting activities in Texas. *Moncrief*, 414 S.W.3d at 151. First, we consider only the specific defendant's contacts with the forum. *Id.* In this analysis, the unilateral activity of another party or a third person is not relevant. *Id.* Second, the contacts relied upon must be purposeful rather than random, fortuitous, or attenuated. *Id.* Third, the nonresident defendant must seek some benefit, advantage, or profit by availing itself of the jurisdiction. *Id.* In this analysis, we do not assess the quantity of the contacts, but rather their nature and quality. *Id.* "[T]he purposeful availment analysis seeks to determine whether a nonresident's conduct and connection to a forum

17

are such that it could anticipate being haled into court there." *Id.* at 152; *see BMC Software*, 83 S.W.3d at 798.

To support the exercise of specific jurisdiction, the plaintiff's causes of action must arise from or relate to the nonresident defendant's forum contacts. *Moki Mac*, 221 S.W.3d at 576. This means that a substantial connection must exist between the nonresident defendant's forum contacts and the operative facts of the litigation. *Id.* at 585. The operative facts are those facts that would be the focus of a trial on the merits. *Id.* at 575; *see also Kaye/Bassman Int'l Corp. v. Dhanuka*, 418 S.W.3d 352, 357 (Tex. App.—Dallas 2013, no pet.); *Pulmosan Safety*, 273 S.W.3d at 839. "But for causation" alone is not sufficient to establish the requisite connection between the forum contacts and the operative facts of the litigation. *Moncrief*, 414 S.W.3d at 157. Whether a plaintiff's claims arise from or relate to the nonresident defendant's Texas contacts is a question of law unaffected by the operation of implied findings of relevant fact necessary to support the special appearance ruling. *Id.* at 150 n.4.

### C. JURISDICTION OVER NON-RESIDENT ATTORNEYS

We begin with a brief review of the law applicable to jurisdiction over nonresident attorneys. As expected, this law is generally consistent with the foregoing fundamental tenets regarding jurisdiction. For instance, a nonresident attorney who has only sporadic contacts with Texas will not be subject to general jurisdiction in Texas. *See Myers v. Emery*, 697 S.W.2d 26, 31–32 (Tex. App.—Dallas 1985, no writ); *see also Fowler v. Litman*, No. 05-07-01056-CV, 2008 WL 2815086, at *3 (Tex. App.—Dallas Jul. 23, 2008, pet. denied) (mem. op.); *Geo-Chevron Ortiz Ranch #2 v. Woodworth*, No. 04-06-00412-CV, 2007 WL 671340, at *5 (Tex. App.—San Antonio Mar. 7, 2007, pet. denied) (mem.

op.); *Daniels v. Blodgett*, No. 05-04-00626-CV, 2005 WL 1120010, at *3 (Tex. App.—Dallas May 12, 2005, no pet.) (mem. op). However, a nonresident attorney's systematic representation of Texas residents may suffice to establish general jurisdiction over a nonresident attorney. *See Nikolai v. Strate*, 922 S.W.2d 229 (Tex. App.—Fort Worth 1996, writ denied).

In a specific jurisdiction analysis, a nonresident attorney's act of entering into an attorney-client relationship with a Texas resident, standing alone, does not provide the minimum contacts necessary to support personal jurisdiction over the nonresident attorney. *Gordon & Doner, P.A. v. Joros*, 287 S.W.3d 325, 335 (Tex. App.—Fort Worth 2009, no pet.)*; Myers*, 697 S.W.2d at 32; *see also Geo-Chevron*, 2007 WL 671340, at *3. Moreover, neither the mere existence of an attorney-client relationship between a Texas resident and a nonresident attorney, nor the routine correspondence and interactions attendant to that relationship, are sufficient to confer specific personal jurisdiction over a nonresident attorney. *Markette v. X-Ray X-Press Corp.*, 240 S.W.3d 464, 468–69 (Tex. App.—Houston [14th Dist.] 2007, no pet.); *see also Proskauer Rose LLP v. Pelican Trading, Inc.*, No. 14–08–00283–CV, 2009 WL 242993, at *4 (Tex. App.—Houston [14th Dist.] Feb. 3, 2009, no pet.) (mem. op.). Similarly, a nonresident attorney's act of contracting with and accepting payment from Texas residents for services performed elsewhere does not support specific jurisdiction over a nonresident attorney. *Weldon-Franke v. Fisher*, 237 S.W.3d 789, 796 (Tex. App.—Houston [14th Dist.] 2007, no pet.); *see Star Tech., Inc. v. Tultex Corp.*, 844 F.Supp. 295 (N.D. Tex. 1993). As stated by one of our sister appellate courts, the "mere act of contracting with a Texas resident does not give rise to specific jurisdiction in Texas: performance must be due in Texas." *Lisitsa v.*

19

*Flit*, 419 S.W.3d 672, 680 (Tex. App.—Houston [14th Dist.] 2013, pet. denied); *see Markette*, 240 S.W.3d at 464; *see also Wilson v. Baker*, No. 03-10-00507-CV, 2011 WL 6938523, at *5 (Tex. App.—Austin Dec. 29, 2011, no pet.) (mem. op.) (holding that Texas court possessed specific jurisdiction over nonresident attorney who did not pay fees where attorney "purposefully initiated contact with Texas residents intending that they would perform work in Texas"). For specific jurisdiction to attach, the claims in the lawsuit must arise from or relate to the nonresident lawyer's purposeful contacts with Texas. *Weldon-Franke*, 237 S.W.3d at 797; *Bergenholtz v. Cannata*, 200 S.W.3d 287, 293–97 (Tex. App.—Dallas 2006, no pet.); *Klenk v. Bustamente*, 993 S.W.2d 677, 682 (Tex. App.—San Antonio 1998, no pet.), *disapproved on other grounds*, *BMC Software*, 83 S.W.3d at 794; *see Markette*, 240 S.W.3d at 468–69. Generally, in order to show that nonresident attorneys have engaged in purposeful contact with Texas, the record must indicate that the nonresident attorneys have sought clients in Texas or otherwise have affirmatively promoted their businesses in Texas. *See, e.g., Bergenholtz*, 200 S.W.3d at 293–97; *Klenk*, 993 S.W.2d at 682; *see also Katz v. Winston & Cashett*, 05-10-01535-CV, 2011 WL 3435789, at *3 (Tex. App.—Dallas Aug. 5, 2011, no pet.) (mem. op.).

## V. FACTS

The appellants filed separate special appearances and amended special appearances. When there are multiple defendants, each defendant's contacts with the forum must be assessed separately. *M & F Worldwide Corp. v. Pepsi-Cola Metro. Bottling Co.*, 453 S.W.3d 492, 502 (Tex. App.—Houston [14th Dist.] 2014, pet. filed); *Citrin Holdings, LLC v. Minnis*, 305 S.W.3d 269, 279 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (citing *Calder v. Jones*, 465 U.S. 783, 790 (1984)). We briefly summarize the facts

20

applicable to all appellants and the operative facts of the underlying proceeding, then review the facts for each appellant individually.

The genetically modified rice MDL was consolidated in federal court in the United States District Court for the Eastern District of Missouri and consisted of claims against Bayer from the five rice-growing states: Texas, Arkansas, Missouri, Louisiana, and Mississippi. The record fails to contain the total number of plaintiffs in the MDL, the number of Texas residents in the MDL, or the number of Texas state cases that were filed against Bayer. For instance, the estimated number of plaintiffs in the MDL varies in the record from five to eleven thousand, and there appears to have been approximately three thousand state court plaintiffs.[8] Appellants generally disclaimed knowledge of the number of Texas residents included in the MDL. Downing testified that he thought "there were hundreds of Texas farmers included in the federal MDL." Isquith agreed that there were a "substantial" number of Texas growers that were part of the MDL litigation. Arsenault testified that "presumably" there were "many" Texas rice growers in the MDL.

Downing and Levitt were appointed by the MDL court to be the two co-lead counsel in the MDL and the remaining appellants were members of the court-appointed plaintiffs' executive committee, which directed the litigation on behalf of the plaintiffs and performed work that benefitted all plaintiffs in the MDL. Co-lead counsel and the plaintiffs' executive committee comprised the leadership group or common benefit attorneys for the MDL. Appellants were thus charged with the responsibility of prosecuting the case for the common benefit of all of the litigants within the MDL. Appellants testified that they

---

[8] For instance, Judge Perry's February 24, 2010 memorandum and order regarding appellants' motion to create a common benefit trust fund recites that, at that time, there were approximately seven thousand plaintiffs included in the MDL.

intended both the MDL litigants and the state court litigants to benefit by their work as the leadership group. In the MDL, Downing and the other appellants: (1) engaged in "substantial factual investigation and legal research under the laws of [the five main rice-producing states, including Texas] in connection with drafting the master complaint; (2) researched "elements and proof required for all claims asserted" under the laws of the five states, including related issues such as the economic loss doctrine, intervening and superseding cause, and vicarious liability; (3) "engaged in . . . briefing regarding the summary judgment and *Daubert*[9] motions under the laws of Arkansas, Mississippi, Louisiana, and Texas"; and (4) "fully briefed all summary judgment issues under Texas law" for the Texas bellwether trial. As leadership counsel, appellants engaged in extensive pretrial activity for and the presentation of the four bellwether trials in Missouri, including the final bellwether case "involving three Texas family farming operations."

Appellants generally testified that the majority of their work on the MDL occurred outside of Texas, although, as discussed in more detail herein, each had some direct contact with Texas in conjunction with their work on the MDL.

Downing and Levitt testified that as co-lead counsel, they were authorized by the MDL court to prosecute the case and to enlist the services of others to do so. Appellants utilized the services of Looper, Reed & McGraw, P.C. ("Looper Reed"), a Texas law firm, to assist in prosecuting the genetically modified rice MDL. Looper Reed was independently appointed by the MDL court to serve on the plaintiffs' executive committee, and was "not a part of the slate" of lawyers that appellants proposed for inclusion in the leadership group. Downing and Levitt testified that they "assigned" common benefit work

[9] *See Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993)(regarding the admissibility of expert testimony).

22

to Looper Reed, but they did not "control[] the means and details of how Looper Reed performed the assigned tasks." Downing and Levitt specifically testified that they "did not actively seek to work" with Chaney or Looper Reed and that the relationship existed "solely by virtue of the MDL court's independent appointment." Downing testified that he and Levitt coordinated the MDL work that they directed Looper Reed to perform. Levitt testified that he and Downing "determined who was going to work on what in somewhat of a collective matter sometimes," and "[p]erhaps on occasion," that included designating work to be performed by Looper Reed. With regard to the genetically modified rice MDL, Downing testified that he had "substantial" communications with Looper Reed, Levitt acknowledged that he had hundreds of communications with Looper Reed, and Isquith and Arsenault testified their firms each had more than a thousand communications with Looper Reed. With the exception of in-person meetings of the executive committee that were held in St. Louis, Missouri, all of appellants' communications with Looper Reed took place by telephone or email.

Appellants created and utilized a website in connection with the rice MDL: www.bayerricelitigation.com. Isquith testified that this website "was informational in nature and employed as a database for existing clients and their attorneys about the status of discovery and other pre-trial matters in the Federal Rice Litigation." The website was maintained by WHAFH. Downing and Levitt testified that the website did not provide an opportunity for users to enter into contracts and it was not used to solicit clients. Downing and Levitt testified that the website instead "was merely used as a vehicle to provide information about the status of discovery and other pre-trial matters in the federal MDL litigation and to provide the contact information of certain members of the MDL

23

Leadership Group, including [ourselves]." Levitt testified that, "as a service to everybody," they kept "more substantial case-related [electronic filings] uploaded as PDFs on the site" so individuals could "download some of the key MDL documents."

Bayer agreed to enter a global settlement of all claims against it in the MDL and in state court. While the settlement agreements in the MDL and state court cases were separate, the two agreements were contingent on each other insofar as Bayer refused to settle the claims against it in a piecemeal fashion. Each of the appellants testified that they were not parties to the qualified settlement fund that was created in accordance with the state court GMB settlement agreement, which was made the basis of this lawsuit, and they did not consent to the forum-selection clause in the documents establishing the qualified settlement fund. According to Watts, however, while appellants were not signatories to the GMB settlement, they were "involved." Watts testified that the GMB state court settlement was negotiated first, and one of Bayer's requirements for that settlement was a settlement for the MDL claims. "And so the different parties had to, in effect, approve the other settlements because there was money moving around between the two." Watts testified that appellants "got to be the signatories on the MDL settlement" and "[w]e got to be the signatories on the GMB settlement." Watts testified that "there was plenty [of] back and forth about what should be in each after the original deal was done."

### A. DOWNING AND GRG

The special appearances filed by Downing and GRG are largely identical and are premised on the same facts and arguments.

By separate affidavits supporting the special appearances, Downing testified that he is currently licensed to practice law in the state of Missouri. He is a shareholder and vice president of GRG. Downing resides and works in Missouri. Neither he nor GRG maintains an office of any type in Texas. Neither Downing nor any of the eleven other attorneys at GRG have a license to practice law in Texas, and there are no GRG employees who work or reside in Texas. Downing testified that neither he nor GRG holds business meetings in Texas, stores any records in Texas, or deposits funds into Texas banks.

Downing testified that the vast majority of his work and that of other GRG attorneys and employees in the genetically modified rice MDL, common benefit work or otherwise, was performed in St. Louis, Missouri. Downing testified that work performed outside of St. Louis by Downing or GRG employees included depositions, but none of those depositions took place in Texas.[10]

GRG attorneys, including Downing, represented approximately nineteen individuals or entities with Texas mailing addresses in the MDL. According to Downing, "all of the claims related to farming operations in Arkansas and/or Missouri and [did not] relate to any Texas farming operations." Downing testified that none of the work that he or GRG performed regarding these attorney-client relationships occurred in Texas. Downing testified that "many" of these individuals and entities were "landlords for farming operations" and "a number [were] related." Downing testified that the claims of these clients represented a fraction of one percent of all settlement claims by GRG clients, and a minimal portion of the firm's clients, acres and recoveries in the MDL.

---

[10] We note that the record reflects that Bayer's field testing agents were deposed in various locations, including Texas.

25

Downing testified that he "assisted in the bellwether trial of Texas farmers' cases" in the MDL court in St. Louis, Missouri; however, each of the Texas farmers in that trial was directly represented by other counsel and all of his services in that trial were conducted in Missouri. By deposition, Downing testified that they had "no representation agreement with any of those growers, and that "[o]ur work in that trial was as a common benefit attorney as co-lead counsel part of the leadership. It was a [b]ellwether trial. So I don't think it's—it's accurate to state that we represented, with an employment agreement, those Texas farmers."

Downing had a contractual agreement to assist Riviana Foods, Inc. ("Riviana"), a company headquartered in Texas, in presenting its bellwether trial for non-producers in the MDL in St. Louis, Missouri.[11] According to Downing, under the agreement, any services to be performed by Downing or any other GRG attorneys would have been performed in St. Louis, Missouri. No GRG attorney, including Downing, traveled to Texas in connection with their representation of Riviana. Riviana settled its claims with Bayer prior to the bellwether trial, and thus Downing testified that "the agreement [with Riviana] was never effectuated."

Downing testified that, other than the attorney-client relationships previously mentioned, he has not contracted to represent any Texas residents in the last five years. Downing testified that neither he nor any other GRG attorney has filed any lawsuits in state or federal court in Texas during the last five years. Downing testified that he has traveled to Texas in connection with litigation twice in the last five years, and five of the eleven other GRG attorneys have traveled to Texas in connection with litigation in the

---

[11] Riviana processes and distributes branded and private label rice products.

past five years.  With the exception of one of Downing's trips, all of these trips were made in conjunction with expert witness depositions in cases having no connection with the MDL.

Downing testified that over the course of the MDL, he made "one single trip to Texas related to the litigation, solely in my capacity as court-appointed co-lead counsel in the MDL, to discuss settlement issues."  Downing testified that, except for this single trip, none of the GRG attorneys or employees traveled to or performed any legal work in Texas in connection with the MDL.  Downing testified that he made the trip to Texas to meet with Watts at his home in San Antonio, Texas to discuss "settlement issues" that were "broader" than merely settling the claims against Bayer.  Watts testified that Downing requested to meet with him to "try to negotiate a deal" regarding settlement with Bayer and also to discuss appellants' demand for attorney's fees from appellees' state court cases.  According to Downing, in order for Bayer to settle the claims against it in the MDL or state court proceedings, eighty-five percent of the acreage affected by Bayer had to agree to participate in a global settlement.  There were Texas residents in the MDL settlement and in the state court GMB settlement, so Downing acknowledged that the settlement discussions addressed, at least in part, settlement of the claims that the Texas residents were bringing against Bayer.  Downing testified that, generally speaking, he had multiple conversations with appellees Phipps and Watts and stated that "generally speaking, the nature of the communications with those two would have been global settlement issues, and common benefit fees."

As co-lead counsel in the MDL, Downing performed services that were intended to benefit all persons or entities who had suffered a loss.  Downing testified that he and

27

the other common benefit attorneys wanted all the rice farmers to participate in receiving compensation from Bayer for the losses they suffered, whether they were litigants in the MDL or not. Downing stated that appellants intended to benefit both the MDL and the state court litigants.

Downing testified that there was "[n]o question" that the state court litigants benefited from appellants' work. Downing contended that "we do believe that Texas growers benefited tremendously" by the work that appellants performed as reflected in their request for payment of attorney's fees from appellants. Downing testified that he intended to be paid for his work in the rice litigation and that all the people who benefited from his work should pay for his services. When Downing was asked if those who benefited from his work included Texas residents, he responded that appellees "certainly [were] benefited by our work and [their] clients were, but the obligation to pay, I think, rested primarily, if not exclusively, with [appellees] because of the nature of [their] fee contract[s] with [their] clients. We have not sued [their] clients."

As co-lead counsel, Downing testified that the MDL attorneys shared discovery with the attorneys for the other MDL litigants; however, he was not sure if they shared information with state court attorneys other than those that had MDL cases. Downing testified that appellants shared discovery with appellees Watts and Phipps, who had both federal MDL and state court clients. Appellants further had joint prosecution agreements with some state court litigants in which appellants agreed to make common benefit materials and work product available to the state court litigants in exchange for their agreement to pay common benefit fees to appellants. Downing testified that appellants obtained an amendment to a protective order issued in the genetically modified rice MDL

28

in order to allow certain state court litigants to benefit from the documents produced in the MDL. Downing reiterated that appellants expected to be paid for their common benefit work in the MDL.

Downing testified that the MDL settlement resulted in a common benefit fund, and that appellants sought and received attorney's fees as a common benefit payment from the fund. Texas MDL clients contributed to the MDL settlement fund, so Downing acknowledged that appellants have received some compensation from the Texas growers in the MDL who contributed to the common benefit fund. However, Downing contended that the monies that appellants received as payment from the common benefit fund did not fully compensate appellants for their work in the genetically modified rice MDL. Downing testified that appellants' common benefit work benefited others, including appellees, who had not paid them for that work.

### B. LEVITT

By affidavit, Levitt testified that he is an attorney currently licensed in good standing to practice law in the states of Illinois and New York. He resigned his partnership with WHAFH in January 2013, and is currently a director of Grant & Eisenhofer, P.A. He works in the firm's Chicago, Illinois, office. When he was at WHAFH, his office was also in Chicago. Neither WHAFH nor his current firm maintain an office in Texas. Levitt testified that he has "never practiced law in the State of Texas" and he is not a member of the State Bar of Texas. Levitt testified that he works and resides in Chicago and has never resided in the State of Texas. He testified that he does not own any real property in the State of Texas, has not deposited any funds in any Texas bank, and does not "travel to Texas for personal or recreational purposes."

Levitt specializes in complex commercial litigation and class action litigation and has sought certification for nation-wide, state-wide, and multi-state class action cases. According to Levitt, he has had certified a "substantial number" in the "mid to high double digits" of nation-wide class actions for the purposes of litigation or settlement. Levitt acknowledged that his certified class actions have included Texas residents. He testified that he has had approximately six state-wide Texas class actions, although none of those cases were filed in Texas. Levitt did not recall having a separate Texas class certified for litigation or settlement.

Levitt testified that he represented two clients in the genetically modified rice MDL who were residents of Texas, however, "both of those clients' claims were filed directly with the United States District Court for the Eastern District of Missouri." Levitt testified that the "only work I performed in Texas in connection with the Genetically Modified Rice Litigation was to travel to defend the depositions of my two clients who resided in Texas," and that "[a]ll other work I performed in the Genetically Modified Rice Litigation for those clients, and non-Texas clients, was done outside of the State of Texas." Levitt testified that work for these clients was principally performed in his Chicago office and in St. Louis, Missouri.

Levitt had attorney-client agreements with Texas residents and farmers, Lee and Robbie Hafernick and Bob Shoemate, who served as the named litigants in the Texas bellwether trial, and he testified that he "personally represented" the plaintiffs in that case. According to Levitt, he had an attorney-client relationship with the Texas farmers and also appeared as lead trial counsel in that case in his capacity as MDL co-lead counsel acting

for all of the MDL litigants. Levitt acknowledged that it was "fair" to state that he was serving in both capacities in that bellwether case.

Levitt testified that the common benefit work that he performed was intended to benefit all rice farmers affected by the genetically modified rice developed by Bayer. He knew that Texas was one of the five largest long-grain rice producing states and agreed that "absolutely" a number of Texas growers benefited from the services he provided as part of the leadership group in the MDL. He testified that he had a "very small number of Texas clients" in the rice litigation. Approximately ninety percent of all rice farmers ended up participating in the settlement, and a proportionate "relatively substantial" number of Texas rice farmers filed claims in the settlement. According to Levitt's resume, he obtained settlements exceeding $900 million on behalf of long grain rice producers and others who suffered losses resulting from contamination of the U.S. rice supply. In his deposition, Levitt explained that this sum included all the money paid by Bayer to settle all the rice cases, including the state court GMB settlement with appellees.

Levitt testified that he is admitted to practice in the United States District Courts for the Eastern, Northern, and Southern Districts of Texas. He has previously filed a lawsuit in the Eastern District of Texas. During the past five years, he has represented "only five Texas residents," and during his legal career, he has traveled to Texas "on only four occasions to meet with my clients, including my travel to Texas to meet with my clients in the Genetically Modified Rice Litigation." He traveled to Texas to defend his Texas clients at their depositions. He testified that his most recent travel to Texas was in 2007.

Levitt testified that he has had thousands of communications with Texas attorneys in connection with the rice litigation. He has had hundreds of communications with Watts

and Phipps on several different topics, including common benefit issues relating to the litigation and settlement with Bayer. The ultimate result was that the federal MDL and the state cases were settled at once. Levitt testified that Bayer wanted to buy "global [peace]." Levitt testified that he believed that appellants were owed a common benefit payment on the state court cases that Phipps and others filed. He indicated that appellants were going to pursue "whatever remedies we were going to seek against Mr. Phipps and others through different means."

**C. WHAFH**

The WHAFH special appearance was supported by the affidavit of Fred T. Isquith. According to his affidavit, Isquith is a licensed attorney in New York and is a member of WHAFH. According to Isquith, WHAFH is not a resident of the State of Texas, but is organized under Illinois law and has its principal place of business in Illinois. WHAFH maintains no general business practice in Texas, although Isquith conceded that WHAFH has had attorney-client relationships with three or four Texas residents in the past few years. WHAFH has no office, bank accounts, or records in Texas, none of its partners or other lawyers are admitted to practice in Texas, and it has not held any partner meetings in Texas. WHAFH does not have a registered agent for service of process in Texas, does not own any real or personal property in Texas, and does not pay taxes to any local or state taxing authorities within Texas.

Because WHAFH "maintains a large nation-wide class action practice and thus has clients who reside in most, if not all, fifty states," it has "a number of clients who are Texas residents." However, according to Isquith, WHAFH has not filed any cases in Texas courts in the past five years, and all work that it does, or has done, on behalf of

any Texas resident was performed in connection with out-of-state litigation and has "rarely" involved travel by WHAFH attorneys to Texas. Isquith testified that members of firm have physically been present in Texas on business-related matters nine or ten times in the past six years.

Isquith testified that WHAFH had two Texas clients in the MDL litigation. Specifically, Isquith testified that WHAFH had a direct contractual relationship with the plaintiffs in the Texas bellwether case that was partially tried; however, Isquith had not been able to find the written employment contract with those clients. According to Isquith, "[n]early all of the common benefit work that [WHAFH] performed in the Federal Rice Litigation, including for the benefit of its two Texas resident clients, was performed outside the State of Texas." Isquith testified that "over the course of the five year litigation, [WHAFH] attorneys travelled to Texas on only five occasions," and "[a]ll communications with Texas-based counsel on the Plaintiffs' Executive Committee occurred at in-person meetings in St. Louis, by email, or by conference or telephone call." Isquith believed that members of the firm made four trips to Texas pertaining to the rice litigation. According to Isquith, these trips were made for the purpose of appearing for the depositions of the firm's clients. Isquith testified that Levitt made one trip to Texas to meet another attorney who introduced Levitt to a number of rice farmers who were considering hiring WHAFH to represent them in the rice litigation. Isquith testified that the firm represented a "relatively substantial" number of Texas rice farmers who filed claims in the settlement with Bayer.

Isquith agreed that Texas residents contributed to the common benefit fund in the MDL litigation through the settlement with Bayer. WHAFH received some portion of those

33

proceeds. Isquith testified that WHAFH expected payment for its services in the genetically modified rice litigation through the common benefit fund, or to the extent it represented rice clients directly, through any recovery that its direct clients would have received. Isquith further asserted that appellants intended to benefit all rice litigants and intended to be compensated by all rice litigants. Isquith believed that he provided legal services for Texas residents or Texas attorneys for which he felt entitled to compensation in the rice litigation. He acknowledged that WHAFH had hundreds of communications with Texas attorneys Watts and Phipps with regard to the rice litigation.

### D. NBA

NBA filed an amended special appearance supported by the affidavit of Richard J. Arsenault. Arsenault has been a member of NBA since approximately 1981. Arsenault testified that he is an attorney-at-law admitted to practice in Louisiana since 1980. He has also been admitted to practice in Texas since 1992, Colorado since 1991, and Washington D.C. since 1991. He is licensed in the Eastern, Southern, and Northern Districts of Texas. His curriculum vitae indicates he has belonged to the Texas Trial Lawyers Association. Arsenault testified that he became licensed in Texas because he thought it would be assistance to have additional licenses in complex litigation and mass torts on a national level.

Arsenault testified that NBA is not a resident of Texas, but is organized under Louisiana law and has its principal place of business in Louisiana. NBA does not have a general business practice in the State of Texas, does not have an office or bank account in Texas, and stores no records in Texas. Three of its lawyers are admitted to practice in Texas, but NBA has not held any firm meetings in Texas. None of NBA's employees

34

reside or work in Texas. NBA does not maintain a registered agent for service of process in Texas, does not own any real or personal property in Texas, and does not pay taxes to any local or state taxing authorities within Texas.

Arsenault testified that NBA represented one of the Texas bellwether plaintiffs, Jamie Gentz, however, "this representation was limited to fewer than four . . . visits to the State of Texas, three of which were to defend the witness during depositions taken by defense counsel." According to Arsenault, "[n]early all" of the common benefit work that NBA performed on behalf of Texas resident plaintiffs in the genetically modified rice MDL was performed outside of Texas, and NBA attorneys travelled "predominantly" to North Carolina, Louisiana, Missouri and Arkansas in connection with that litigation.

Arsenault testified that he actively participated in the trial of the bellwether case featuring Texas rice farmers. He testified that he did not have a contract with the three Texas rice growers he was representing in that case, but he conceded that he had "whatever relationship someone in a leadership capacity has in an MDL to all plaintiffs in that MDL." Arsenault testified that the Texas farmers were directly represented by other attorneys, however, he helped protect their rights as an attorney, and he sought and received compensation for those services in the MDL.

Arsenault also testified that NBA had an attorney-client relationship with "approximately" eighteen Texas residents with claims in the genetically modified rice MDL. Arsenault testified that these clients "were all retained post-settlement and were all non-farmer landowners for Louisiana farmer clients." Arsenault testified that NBA assisted these clients in preparing the necessary claim forms to receive settlement benefits from Bayer and that NBA charged these Texas clients for its services.

35

In terms of other litigation, Arsenault testified that NBA has clients who are Texas residents, however, he stated "that is only because it maintains a nation-wide mass tort and class action practice and thus has clients who reside in most, if not all, fifty states." Texas resident clients whom NBA currently represents primarily have, or have had, federal multidistrict litigation or mass tort litigation pending in other states. In his deposition testimony, Arsenault stated that he had been involved in other matters involving Texas litigation, and stated that he recalled three other instances where he had Texas clients or cases that were filed in Texas. He recalled trying one case in Beaumont, but did not recall participating in any other Texas cases.

Arsenault estimated that fifty percent of NBA's work involves traditional litigation and fifty percent consists of class actions and mass tort cases. Many of the class action cases and mass tort cases are nation-wide in scope and include Texas. Arsenault has served on twenty national leadership committees in mass tort or multidistrict litigation cases. Arsenault conceded that he has two multidistrict litigation matters pending in Texas, but Arsenault testified that he did not select Texas as the venue for these cases and instead, the Judicial Panel on Multidistrict Litigation decided where the cases would be tried. Arsenault is a member of the leadership committee in the multidistrict litigation matter arising from the Pinnacle hip implant, *In re DePuy Orthopaedics, Inc.*, in the United States District Court for the Northern District of Texas, and has filed dozens of related-case pleadings in that case.

Arsenault testified that attorneys who serve on leadership committees in multidistrict litigation cases are charged with the responsibility of prosecuting the case for the common benefit of all the litigants in the litigation, and "they have a fiduciary obligation

to all plaintiffs that are in the case," even where they are represented by other lawyers, and "the fiduciary obligation would extend to the lawyers in those instances."

Arsenault testified that the work he and NBA performed in the genetically modified rice MDL benefited the litigants in the MDL action as well as similarly situated claimants who brought their cases in state court rather than the MDL. Arsenault intended his services to benefit all state court litigants who were not part of the MDL and expected to be compensated for his services. Arsenault testified that under the common benefit doctrine, anyone who is the beneficiary of common benefit work has a corresponding obligation to compensate those that provided the common benefit services. Arsenault testified that appellants did not prohibit anyone from obtaining the common benefit work that appellants provided, and that state court litigants obtained and utilized appellants' common benefit work. Arsenault testified that it was the appellants' intention that all of the rice litigants would be able to obtain and use the common benefit work. Arsenault acknowledged that it was beneficial to the federal MDL litigants if state court litigants were successful in prosecuting their separate claims.

Arsenault testified that NBA had a website with a "landing page," or "satellite website" that dealt specifically with the genetically modified rice MDL. The website did not contain a "pop up" allowing real-time communication, but contained a "block" that allowed individuals to communicate with the firm to seek information about the litigation. Arsenault agreed that the website was "all part of a marketing effort both to distribute information about the litigation but also to attract rice litigants."

**VI. ANALYSIS**

37

We begin our analysis with specific jurisdiction. In this case, all claims against appellants arise from the same forum contacts, so we do not perform a separate claim-by-claim analysis. *See Moncrief*, 414 S.W.3d at 151. In a specific jurisdiction analysis, we focus on the relationship among the appellants, the forum, and the litigation, and determine whether a substantial connection exists between appellants' contacts with Texas and the operative facts of the litigation. *Kelly*, 301 S.W.3d at 658; *Moki Mac*, 221 S.W.3d at 575–76. We consider the "quality and nature of [these] contacts, rather than their number." *Am. Type Culture*, 83 S.W.3d at 806. And, we must conclude that appellants' purposeful conduct, rather than another's, caused their contact with Texas. *See Michiana*, 168 S.W.3d at 784. A substantial connection can result, however, from a single purposeful act. *Moncrief*, 414 S.W.3d at 151–52.

## A. CONTACTS

With these principles in mind, we turn to the allegations in this case and appellants' contacts with Texas. To the extent possible, we have grouped the jurisdictional facts into categories.

### 1. Attorney Client Representation

Appellants contend that their attorney-client contracts with Texas residents, alone, are not sufficient to establish the minimum contacts necessary to support the exercise of personal jurisdiction over them. *See Gordon & Doner, P.A.*, 287 S.W.3d at 335*; Myers*, 697 S.W.2d at 32. Appellants also argue that their performance under the contracts and as leadership counsel generally involved the provision of their services in Missouri, rather than in Texas, and thus jurisdiction is not proper in Texas. *See Lisitsa*, 419 S.W.3d at 680; *Weldon-Franke*, 237 S.W.3d at 796.

38

Appellants directly represented Texas residents and Texas landowners in the MDL. Further, and more significantly, appellants sought out and obtained roles as co-lead counsel or members of the plaintiffs' executive committee for all plaintiffs in the rice litigation MDL. The rice litigation MDL arose from Texas as one of the five main rice-producing states. There were hundreds, if not thousands, of Texas residents or landowners involved in the MDL. The MDL alleged damage to Texas property, Texas businesses, and Texas citizens. Appellants drafted the pleadings in the MDL, in part, on Texas law. Texas citizens served as the plaintiffs in one of the bellwether trials.

As leadership counsel, appellants testified that they felt that they had obligations to all MDL participants and even to their attorneys.[12] Moreover, all appellants intended their work in the MDL to benefit all state-court litigants, including Texans. Appellants did not engage in sporadic, random representation of Texas clients, instead, they sought out and chose to accept leadership roles on the executive committee of the MDL and thereby systematically undertook to represent hundreds of Texas clients in the MDL, intending both Texas state court litigants and their attorneys to rely on and benefit from that representation. *Cf. Nikolai*, 922 S.W.2d at 229.

Moreover, while the appellants' work on the rice MDL occurred mainly in Missouri rather than Texas, we do not consider this factor dispositive given the span and breadth of the litigation's nexus with Texas. The Texas Supreme Court has found jurisdiction over nonresidents with no physical ties to Texas when a nonresident attended two Texas

---

[12] The attorney-client relationship gives rise to a fiduciary relationship as a matter of law. *See Meyer v. Cathey*, 167 S.W.3d 327, 330–31 (Tex. 2005) (per curiam); *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 199 (Tex. 2002). Whether or not there is a direct or formal attorney-client relationship between plaintiffs in an MDL and the leadership group of attorneys representing the plaintiffs in the MDL, both the leadership group and the individually retained plaintiffs' attorneys "necessarily" owe a fiduciary obligation to the plaintiffs in the MDL. *In re San Juan Dupont Plaza Hotel Fire Litig.*, 111 F.3d 220, 234 (1st Cir. 1997).

meetings with a Texas corporation and accepted alleged trade secrets created in Texas regarding a potential joint venture in Texas with the Texas corporation, *see Moncrief*, 414 S.W.3d at 154; when an out-of-state contract was formed "for the sole purpose of building a hotel in Texas," *Zac Smith & Co., Inc. v. Otis Elevator Co.*, 734 S.W.2d 662, 665–66 (Tex. 1987); and when enrollment for an out-of-state school was executed in Arizona but was "actively and successfully solicited" in Texas. *Siskind v. Villa Found. for Educ.*, Inc., 642 S.W.2d 434, 437 (Tex.1982); *see also Michiana*, 168 S.W.3d at 789–90 (discussing cases finding specific jurisdiction when forum contact "was aimed at getting extensive business in or from the forum state"). Appellants chose to undertake leadership roles in representing hundreds of Texans in the rice litigation, knowing that these clients were located in Texas and that the case involved damage to Texas property. Overall, we consider that appellants' representation of Texans in the MDL, both directly and as members of the leadership group, supports jurisdiction in Texas.

## 2. Communications and Travel

Appellants contend that their visits to Texas were nonexistent or sporadic, and that the routine correspondence and interactions attendant to appellants' relationships with their Texas clients were insufficient to confer specific personal jurisdiction over appellants. *See Markette*, 240 S.W.3d at 464. It is not the quantity but the quality and nature of the contacts that are important to the minimum-contacts analysis. *See Coleman*, 83 S.W.3d at 806; *see also Retamco*, 278 S.W.3d at 339 ("[T]he minimum-contacts analysis is focused on the quality and nature of the defendant's contacts, rather than their number."); *Tempest Broad. Corp. v. Imlay*, 150 S.W.3d 861, 875 (Tex. App.—Houston [14th Dist.] 2004, no pet.).

Based on the record, all appellants traveled to Texas at least once regarding the rice litigation and most visited Texas on several occasions. For instance, Levitt and Isquith traveled to Texas to present their clients for deposition. According to Isquith, Levitt also visited Texas for the purpose of meeting potential clients in the rice MDL. Arsenault traveled to Texas on at least four occasions in connection with the MDL. Significantly, Downing traveled to Texas on behalf of all appellants to negotiate the global settlement with Bayer and to specifically discuss and demand the disputed fees that are at issue in this lawsuit. *See Moncrief*, 414 S.W.3d at 154.

Appellants engaged in hundreds, or thousands, of communications with individuals in Texas regarding the rice litigation. Appellants engaged in hundreds of communications with Texans in attempting to settle the claims in the genetically modified rice MDL in conjunction with the settlement of the state court claims. Appellants participated in months of negotiations with Texas lawyers and Texas residents and participated in drafting settlement agreements affecting Texas real property and assets in Texas. Appellants engaged in hundreds of communications with Texans in attempting to procure their alleged share of the fees from the state court settlement.

Appellants' contacts with Texas were not random, fortuitous or attenuated. *See BMC Software*, 83 S.W.3d at 795; *Tempest Broad. Corp.*, 150 S.W.3d at 875–76. Further, as stated previously, even a single act can support jurisdiction so long as it is substantial. *See Cartlidge v. Hernandez*, 9 S.W.3d 341, 348 (Tex. App.—Houston [14th Dist.] 1999, no pet.); *Mem'l Hosp. Sys.*, 835 S.W.2d at 650–51, and the record indicates that Downing traveled to Texas to negotiate settlement of the rice litigation and to seek attorney's fees from appellees' state court claims. Considering the overall quality and nature of the

41

appellants' contacts with Texas, including but not limited to Downing's trip to Texas, we conclude that this factor predominates in favor of jurisdiction in Texas. *See Coleman*, 83 S.W.3d at 806; *see also Retamco*, 278 S.W.3d at 339.

### 3. Website

Appellees contend that the rice litigation website utilized by appellants constitutes a jurisdictionally significant contact with Texas. Appellants contend that the website was passive and, accordingly, lacks significance in our analysis.

For jurisdictional purposes, we analyze cases involving a website according to the degree of interaction allowed by the website. Specifically, internet usage is divided into three categories, using a sliding scale, for the purposes of establishing personal jurisdiction. *Choice Auto Brokers, Inc. v. Dawson*, 274 S.W.3d 172, 177–78 (Tex. App.—Houston [1st Dist.] 2008, no pet.); *Reiff v. Roy*, 115 S.W.3d 700, 705 (Tex. App.—Dallas 2003, pet. denied). "At one end of the scale are websites clearly used for transacting business over the [i]nternet, such as entering into contracts and knowing and repeated transmission of files of information, which may be sufficient to establish minimum contacts with a state." *Reiff*, 115 S.W.3d at 705; *see Choice Auto Brokers, Inc.*, 274 S.W.3d at 177–78. "Interactive" websites that allow the "exchange" of information between a potential customer and a host computer are in the middle of the scale. *Reiff*, 115 S.W.3d at 706; *see Choice Auto Brokers, Inc.*, 274 S.W.3d at 177–78. "Passive" websites that are used only for advertising over the internet are not sufficient to establish minimum contacts even though they are accessible to residents of a particular state." *Id.* at 705–06.[13]

---

[13] Much of the analysis regarding websites is devoted to their place in a general jurisdiction analysis rather than a specific jurisdiction analysis, as applicable in this case. *See, e.g., Exchequer Fin. Grp., Inc.*

42

The rice litigation website was not interactive and did not allow the exchange of information between a potential customer and the host computer. Accordingly, in a typical analysis, this factor would not support jurisdiction. *Reiff*, 115 S.W.3d at 706; *see Choice Auto Brokers, Inc.*, 274 S.W.3d at 177–78. However, the website contained the electronic pleadings filed in the MDL which were informational in nature and which appellants intended to be used by state court litigants. The website could thus be characterized as one which allowed the knowing and repeated transmission of files. *Reiff*, 115 S.W.3d at 705; *see Choice Auto Brokers, Inc.*, 274 S.W.3d at 177–78. Given that the rice website utilized by appellants in the MDL was intended to and did provide the repeated transmission of documents to state court litigants, and that the use of these documents allegedly benefited the state court litigants and is a basis for the appellants' claims for compensation, we conclude that the genetically modified rice website is a factor which weighs in favor of jurisdiction.

### 4. Appellants' Relationships with Texas Entities

Appellees contend that appellants' contacts with Looper Reed, a law firm located in Texas, are significant in our jurisdictional analysis. As stated previously, in examining appellants' contact with Texas, we do not consider the unilateral activity of another party or a third person. *See IRA Res., Inc. v. Griego*, 221 S.W.3d 592, 596 (Tex. 2007) (per curiam); *see e.g., Gordon & Doner, P.A. v. Joros*, 287 S.W.3d 325, 335 (Tex. App.—Fort Worth 2009, no pet.). Nevertheless, the contacts of an agent or corporate representative may be sufficient to confer jurisdiction on the principal. *MasterGuard L.P. v. Eco Techs.*

---

*v. Stratum Dev., Inc.*, 239 S.W.3d 899, 909 (Tex. App.—Dallas 2007, no pet.); *see also Klug v. Wickert*, No. 05-14-00080-CV, 2015 WL 4338424, at *6 (Tex. App.—Dallas July 16, 2015, no. pet. h.); *My Vacation Europe, Inc. v. Sigel*, No. 05–14–00435–CV, 2015 WL 316319, at *5 (Tex. App.—Dallas Jan. 26, 2015, no pet.) (mem. op.).

43

*Int'l LLC*, 441 S.W.3d 367, 377 (Tex. App.—Dallas 2013, no pet.); *Olympia Capital Assocs., L.P. v. Jackson*, 247 S.W.3d 399, 412–13 (Tex. App.—Dallas 2008, no pet.). Consequently, the question is whether Looper Reed's actions are attributable to appellants for purposes of the specific jurisdiction analysis.

An essential element of the principal-agent relationship is the alleged principal's right to control the actions of the alleged agent. *Exxon Corp. v. Tidwell*, 867 S.W.2d 19, 21 (Tex. 1993); *Olympia Capital Assocs., L.P.*, 247 S.W.3d at 412–13. This right includes not only the right to assign tasks, but also the right to dictate the means and details of the process by which an agent will accomplish the task. *Olympia Capital Assocs., L.P.*, 247 S.W.3d at 412–13; *Ross v. Tex. One P'ship*, 796 S.W.2d 206, 210 (Tex. App.—Dallas 1990), *writ denied*, 806 S.W.2d 222 (Tex.1991) (per curiam). In the instant case, the record is clear that appellants directed Looper Reed in the prosecution of the MDL; however, the record indicates that appellants did not retain the right to control the details of Looper Reed's work in the genetically modified rice MDL. Accordingly, we do not consider the acts of Looper Reed as imputed to appellants or determinative of our specific jurisdiction analysis. *See Olympia Capital Assocs., L.P.*, 247 S.W.3d at 412–13.[14]

We further note that Downing testified that appellants entered into joint prosecution agreements with Texas entities[15] regarding the prosecution of related Texas cases and

---

[14] While we do not attribute Looper Reed's contacts with Texas to appellants, we nevertheless conclude that appellants' delegation of work to, and communications with, Looper Reed are not wholly insignificant factors in our analysis. Appellants both instigated and authorized significant activity in Texas. *Cf. IRA Res., Inc.*, 221 S.W.3d at 598; *see Citrin*, 305 S.W.3d at 283 (stating that a non-resident's multiple Texas contacts over many months in the course of an ongoing relationship that was not unilaterally initiated by the Texas resident demonstrated purposeful contact with Texas along with an intent to obtain benefits from these contacts).

[15] Appellants entered into separate joint prosecution agreements with, among others, Riviana and a different Texas company, Beaumont Rice Mills.

sharing common benefit materials. In this regard, a nonresident's entry into a joint prosecution agreement with a Texas entity does not necessarily the nonresident to jurisdiction in Texas. *See, e.g., Gordon & Doner, P.A. v. Joros*, 287 S.W.3d 325, 334 (Tex. App.—Fort Worth 2009, no pet.) (rejecting a joint venture agreement as a source of jurisdiction when the agreement did not focus on litigation in Texas and the contemplated activity occurred by the Texas member of the joint venture); *Langston*, 255 S.W.3d at 411 (holding partnership's contacts with state not imputed to individual nonresident partner to establish personal jurisdiction absent evidence partner participated in litigation in Texas or had other individual contacts); *see also Moni Pulo Ltd. v. Trutec Oil & Gas*, Inc., 130 S.W.3d 170, 175 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) (op. on reh'g) (holding acts of one joint venturer in business that did not focus on Texas "did not create jurisdiction, as opposed to liability, of other—that is, there are no imputed minimum contacts").

Overall, appellants' relationships with the Texas entities discussed here does not weigh in favor of personal jurisdiction.

### 5. Summary

We conclude that appellants' contacts with Texas were substantial and purposeful. Appellants sought and obtained leadership roles in the genetically modified rice MDL knowing that Texas was one of the five main rice-producing states involved in that litigation. Appellants' contacts with Texas, through representing Texans directly and as members of the leadership group, were neither random nor attenuated.

Further, in determining whether appellants purposefully directed action toward Texas, we may look to conduct beyond the particular business transaction at issue

45

because additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State. *Moki Mac*, 221 S.W.3d at 577; *see also Michiana*, 168 S.W.3d at 786. As a group, appellants had mass tort and nation-wide class action practices that included Texas clients. One appellant testified that he obtained a Texas law license because he thought it would benefit his business. One appellant had an interactive website. One appellant visited Texas to solicit Texas clients in the rice litigation. In summary, appellants sought clients and affirmatively promoted their business in Texas. *See IRA Res., Inc.*, 221 S.W.3d at 597; *Moki Mac*, 221 S.W.3d at 575–76; *Michiana*, 168 S.W.3d at 785.

We conclude that, far from seeking to avoid Texas, appellants sought out Texas and the benefits and protections of its laws. *Moncrief*, 414 S.W.3d at 154; *Michiana*, 168 S.W.3d at 785; *BMC Software*, 83 S.W.3d at 795.

## B. BENEFIT, ADVANTAGE, OR PROFIT

We next consider whether appellants sought some benefit, advantage, or profit by availing themselves of Texas. *Moncrief*, 414 S.W.3d at 151. Appellants sought leadership roles in the MDL knowing that Texas was one of the five rice-producing states. Appellants utilized Texas law and a Texas law firm in their prosecution of the MDL. Appellants selected Texas landowners to serve as the plaintiffs in one of the seminal bellwether trials in the MDL. Appellants were paid attorney's fees directly from any Texas clients that they had and they also received common benefit funds from recoveries from Texans. According to estimates in the record, the common benefit funds included approximately $6 million derived from settlement recoveries attributable to Texas farmers. Appellants currently seek to recover additional attorney's fees from the qualified

46

settlement fund for the state court litigants, which includes funds for Texas residents. In this regard, we note that appellants generally assert that they are only seeking fees from appellees, as attorneys for the state court litigants, rather than from the state court litigants themselves, however, even if we characterize appellants' claims in this manner, appellants seek attorney's fees from, inter alia, attorneys who are Texas residents.

We conclude that the record supports the trial court's implied finding that appellants sought the benefits, advantages, and profits inherent in representing hundreds or thousands of Texans in the rice MDL, most specifically in the form of attorney's fees. *See id.*

### C. SUBSTANTIAL CONNECTION

Finally, we examine whether there is a substantial connection between the appellants' contacts with Texas and the operative facts of this litigation. *See Moki Mac*, 221 S.W.3d at 576, 585. In terms of the specific dispute at issue, appellants admittedly thought that they had earned the attorney's fees at issue in this lawsuit. Appellant Downing traveled to Texas and met with Watts at his home to, in part, attempt to resolve appellants' claims to the disputed fees. Appellants had hundreds of communications with appellees in Texas about the fees. In this regard, we note that appellants were not signatories to the state court settlement, and have pointed out that they did not agree to the venue provision in that agreement. However, the record nevertheless reflects that the MDL settlement and the GMB state court settlement were effectively negotiated together and contingent on each other, and appellants effectively had to approve the state court settlement in order to settle the MDL.

We conclude that the claims in this lawsuit arise from or relate to appellants' purposeful contacts with Texas. *See Weldon-Franke*, 237 S.W.3d at 797; *Bergenholz*, 200 S.W.3d at 293–97. Appellants intended the Texas litigants to profit from their common benefit work and intended Texas lawyers to use their common benefit work, and sought payment from the Texas state court litigants and their Texas attorneys for their common benefit work. The rights to these fees are directly at issue in the underlying action for declaratory judgment.

### D. CONCLUSION

In determining whether jurisdiction exists, each case turns on its own facts. *Guardian Royal Exch. Assur., Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 231 (Tex. 1991); *Schlobohm v. Schapiro*, 784 S.W.2d 355, 358 (Tex. 1990). Considering the quality and nature of appellants' contacts with Texas, we conclude that the record supports the exercise of jurisdiction over appellants in this litigation. *See Am. Type Culture*, 83 S.W.3d at 806. Appellants as a group sought to systematically represent hundreds of Texas litigants in their claims against Bayer in the MDL, and further admittedly sought to represent Texas state court litigants with the same or similar claims against Bayer. Focusing on the relationship among the appellants, Texas, and this litigation, we conclude that a substantial connection exists between appellants' contacts with Texas and the operative facts of the litigation. *See Kelly*, 301 S.W.3d at 658; *Moki Mac*, 221 S.W.3d at 575–76.

### VII. FAIR PLAY AND SUBSTANTIAL JUSTICE

Having found that appellants purposefully established minimum contacts with Texas, we next consider whether the exercise of personal jurisdiction over appellants

comport with traditional notions of fair play and substantial justice. Specifically, in addition to sufficient minimum contacts, due process requires the exercise of personal jurisdiction to comply with traditional notions of fair play and substantial justice. *Retamco*, 278 S.W.3d at 338. In this regard, appellants argue that they will be burdened by having to appear and litigate this case in Texas, as they do not live or work in or near Texas and most, if not all, of the witnesses necessary for their defense reside outside the State of Texas, "save and except, perhaps, representatives of co-defendant Looper Reed."

If a nonresident has minimum contacts with the state, then the exercise of jurisdiction over the nonresident will rarely offend traditional notions of fair play and substantial justice. *Moncrief*, 414 S.W.3d at 154–55; *Retamco*, 278 S.W.3d at 338. In evaluating this component of personal jurisdiction, we consider the following factors: (1) the burden on the defendant; (2) the interests of the forum in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies. *Moncrief*, 414 S.W.3d at 150; *Guardian Royal*, 815 S.W.2d at 232. The defendant must present "a compelling case that the presence of some consideration would render jurisdiction unreasonable." *Spir Star AG v. Kimich*, 310 S.W.3d 868, 879 (Tex. 2010); *Dodd*, 426 S.W.3d at 287.

The fact that appellants are not Texas residents is insufficient in itself to show that their burden is excessive. *See Henkel v. Emjo Investments, Ltd.*, No. 01-14-00703-CV, __ S.W.3d __, __, 2015 WL 5076287, at *5 (Tex. App.—Houston [1st Dist.] Aug. 27, 2015, no. pet. h.); *Tempest Broad. Corp. v. Imlay*, 150 S.W.3d 861, 877 (Tex. App.—Houston

[14th Dist.] 2004, no pet.).  Further, subjecting appellants to suit in Texas certainly imposes a burden on them, but the same can be said of all nonresidents; thus, distance alone cannot ordinarily defeat jurisdiction.  *Moncrief*, 414 S.W.3d at 155; *Spir Star*, 310 S.W.3d at 879.  Given the appellants' use of the Texas legal system "and their increased familiarity with the forum and legal system" through representing Texans in lawsuits based in relevant part on Texas law, "the burden of litigating in Texas is not so severe as to defeat jurisdiction."  *Cf. Moncrief*, 414 S.W.3d at 155; *Spir Star*, 310 S.W.3d at 879.  In this regard, we note that courts generally do not find any problems with fair play and substantial justice in exercising jurisdiction over attorneys when the courts have jurisdiction over the attorneys' clients*.  See, e.g., In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 314 F.3d 99, 103 n.7 (3rd Cir. 2002); *In re Diet Drugs*, 282 F.3d 220, 231 (3rd Cir. 2002); *Wartsila NSD N. Am., Inc. v. Hill Int'l, Inc.*, 269 F. Supp. 2d 547, 557 (D.N.J. 2003).  Finally, because appellants' claims will be litigated with those defendants who did not appeal the denial of their special appearances, it promotes judicial economy to litigate the claims as to all parties in one court.  *See Moncrief*, 414 S.W.3d at 155; *Spir Star*, 310 S.W.3d at 879.  On balance, the burden on the appellants of litigating in a foreign jurisdiction is minimal and outweighed by Texas's interests in adjudicating the dispute.  *Moncrief*, 414 S.W.3d at 155.

After weighing all of the relevant factors, we conclude that exercising personal jurisdiction over appellants would not offend the traditional notions of fair play and substantial justice.

## VIII. CONCLUSION

50

Having concluded that the facts support specific jurisdiction over the appellants, we need not address general jurisdiction. *See* TEX. R. APP. P. 47.1, *see, e.g., Citrin Holdings, LLC v. Minnis*, 305 S.W.3d 269, 279 (Tex. App.—Houston [14th Dist.] 2009, no pet.); *Flanagan v. Royal Body Care, Inc.*, 232 S.W.3d 369, 378 (Tex. App.—Dallas 2007, pet. denied). We note, in this regard, that evidence informing the trial court's decision comprised affidavits, including multiple affidavits from the same individuals, answers to discovery, and deposition testimony. The jurisdictional facts as alleged by appellants were frequently unclear, obfuscated, or directly contradicted by other evidence. To the extent that the trial court's resolution of evidentiary conflicts turned on credibility determinations or the weight of the evidence, we do not disturb it herein. *Benoit v. Wilson*, 239 S.W.2d 792, 796–97 (Tex. 1951); *Young Chevrolet, Inc. v. Tex. Motor Vehicle Bd.*, 974 S.W.2d 906, 914 (Tex. App.—Austin 1998, pet. denied).

We lift the stay previously imposed in this cause and we affirm the order of the trial court denying appellants' special appearances.


NORA L. LONGORIA
Justice

Delivered and filed the
8th day of October, 2015.